733 A.2d 1220

CHARLES MAUDSLEY AND BARBARA MAUDSLEY, PLAINTIFFS–APPELLANTS, v. STATE OF NEW JERSEY, NEW JERSEY STATE POLICE DEPARTMENT, TROOPER GARY D. RHILE, TROOPER JOSEPH BROWN, TROOPER MARK WEEKS, TROOPER BRIAN CRAIN, TROOPER JOHN HUNT, TROOPER STEVEN J. COZZI, TROOPER DENNIS MCNULTY, TROOPER JOSEPH FARRO, SERGEANT JAMES KANZ, AND R. MILITANO, IN THEIR OFFICIAL CAPACITY AND INDIVIDUALLY, CAPE MAY COUNTY, CAPE MAY COUNTY PROSECUTOR'S OFFICE, CAPE MAY COUNTY NARCOTICS TASK FORCE, ROBERT CRAMER, CAPE MAY COUNTY NARCOTICS TASK FORCE INVESTIGATOR, IN HIS OFFICIAL CAPACITY AND INDIVIDUALLY, AGENT STEVEN MCSHAFFRY, AGENT OF THE CAPE MAY COUNTY NARCOTICS TASK FORCE, IN HIS OFFICIAL CAPACITY AND INDIVIDUALLY, LIEUTENANT A. BARNETT, SUPERVISOR OF THE CAPE MAY COUNTY NARCOTICS TASK FORCE, IN HIS OFFICIAL CAPACITY AND INDIVIDUALLY, LOWER TOWNSHIP POLICE DEPARTMENT, DETECTIVE WILLIAM HINKLE OF THE LOWER TOWNSHIP

POLICE DEPARTMENT, IN HIS OFFICIAL CAPACITY AND INDIVIDUALLY, AND CAPE MAY COUNTY SHERIFF'S DEPARTMENT, DEFENDANTS–RESPONDENTS, AND LIEUTENANT E. JOHNSON, LIEUTENANT J. GRUSEMEYER, DETECTIVE W. THOM, DETECTIVE C. DINGER, DETECTIVE T. GILBERT AND DETECTIVE W. CAREY, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued June 14, 1999—Decided July 27, 1999.

Before Judges HAVEY, SKILLMAN and LESEMANN.

*Richard A. Grossman* argued the cause for appellants (*Grossman, Kruttschnitt, Heavey & Jacob,* attorneys; *Mr. Grossman,* of counsel and on the brief with *Roberta DiBiase*).

*Mamta Patel,* Deputy Attorney General, argued the cause for the State respondents (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Ms. Patel,* on the brief).

*Hance C. Jaquett* argued the cause for the County respondents with the exception of Lt. Robert Cramer (*Serber, Konschak & Jaquett,* attorneys; *Mr. Jaquett,* of counsel; *Eric C. Garrabrant,* on the joint brief filed by respondents).

*Michael A. Fusco, III,* attorney for respondent Lt. Robert Cramer (*Mr. Fusco* on the joint brief).

The opinion of the court was delivered by

HAVEY, P.J.A.D.

Plaintiffs filed this action under 42 *U.S.C.A.* § 1983, for damages arising out of a search of plaintiff Charles Maudsley's (Maudsley) fishing boat, the "Imperial." Plaintiffs claim that defendants, members of the State Police, as well as members of the Cape May County Narcotics Task Force, the County Prosecutor's Office and Sheriff's Department, and the Lower Township Police Department (the County defendants) violated Maudsley's protection against unreasonable searches and seizures under the Fourth Amendment and Article I, § 7 of the New Jersey Constitution.

Pertinent here are two pretrial rulings. The first denied plaintiffs' motion to compel the County defendants to disclose the identity of a confidential informant whose information formed the basis of a warrant to search the Imperial. The second are partial summary judgment rulings in favor of the County defendants determining that the search warrant was supported by probable

cause and therefore valid. Essentially, these rulings precluded plaintiffs from presenting evidence that the conduct of the County defendants, who applied for the search warrant, was objectively unreasonable because they failed to investigate and corroborate the information provided to them by the informant. Specifically, an August 16, 1996 order entered by the trial court provides:

that plaintiffs are precluded from presenting any evidence, at trial, pertaining to the investigation of Robert Cramer, Steven McShaffry, Lt. Al Barnett, the Cape May Prosecutor's Office, and the Cape May County Narcotics Task Force, and their individual officers and agents, pertaining to said defendants' investigation, the application for the search warrant and a violation of plaintiff's civil rights as said violation may relate [to] the police conduct in obtaining the search warrant.

During the trial to a jury, plaintiffs conceded that they no longer had a viable § 1983 claim against the County defendants in light of the trial court's pretrial rulings.[1] Consequently, the trial court dismissed the claim.

The single issue presented to the jury was whether the State Police defendants had used unreasonable and excessive force by committing assaults upon Maudsley and unlawfully detaining and frisking him during the execution of the warrant. The jury rendered a no-cause verdict in favor of each of the State Police defendants.

Plaintiffs now appeal, raising the following points:

*Point I*—The trial court erred in dismissing claims against the county defendants and in [ruling] that plaintiffs could not introduce evidence at trial of the lack of investigation.

*Point II*—It was error for the trial court to refuse to compel an identification of the confidential informant.

*Point III*—The verdict in favor of the State Troopers was against the weight of the evidence and so shocking to the judicial conscience that the court erred in not granting a new trial.

We conclude that the trial court erred in denying plaintiffs' motion to compel disclosure of the identity of the informant. We therefore reverse that order, the subsequent partial summary judg-

---

[1] A related claim that the County defendants had caused $150,000 in damages to the Imperial during the search was dismissed voluntarily by plaintiffs.

ment, and the judgment dismissing the complaint against the County defendants and remand for further proceedings. We affirm the judgment entered on the jury's no-cause verdict in favor of the State Police defendants.

As noted, prior to trial, the County defendants moved for partial summary judgment arguing that they were entitled to qualified immunity because their actions were based upon a search warrant, lawfully issued, and supported by probable cause. The evidentiary material presented in support of the motion established that on October 2, 1991, Senior Investigator Robert Cramer of the Cape May County Narcotics Task Force, applied for a warrant to search the Imperial. In his application Cramer described the Imperial. The evidence to be seized was referred to as various controlled dangerous substances, weapons and "unidentified persons at the premises...." Cramer prepared the application in support of the warrant based upon conversations he had with Task Force Agent Steven McShaffry. The following facts were set forth in Cramer's application:

(a) On September 27, 1991 a confidential informant [hereafter] referred to as CI–1, who has provided information in the past that has led to the arrest and conviction of numerous persons for violations of controlled dangerous substance laws. Contacted Agent McShaffry of the Cape May County Narcotics Task Force and stated that within the next few days a large shipment of Cocaine would be coming into the Lobster House docks on a fishing boat. CI–1 stated that the shipment would be coming from the south possibly Florida. CI–1 stated that he might be able to make an introduction to the people on this boat and arrange for the purchase of several kilos of Cocaine.

(b) On October 1, 1991 CI–1 contacted Agent McShaffry of the Cape May County Narcotics Task Force and stated that the boat with the shipment of Cocaine had arrived and was now tied up at the Lobster House dock in Lower Twp. CI–1 told Agent McShaffry that he needed a ride to the dock so that he could meet with the people on the boat. Agent McShaffry drove the CI to the Lobster House dock and dropped him off, and watched him walk to a large black steel [hulled] boat where he met with a latin male with black hair and a mustache. CI–1 described this unidentified latin male as being a Cuban and said he had a tattoo of what appeared to be the virgin Mary on a crucifix on his right forearm. This unidentified latin male spoke to the CI briefly. Then the unidentified latin male took CI–1 onto the boat and down into a cargo hold and showed him a pallet of clear plastic bags that contained Kilo Grams of Cocaine. CI–1 stated that the unidentified latin male told him that he would sell the Cocaine for $20,000.00

(Twenty Thousand Dollars) a Kilo. CI–1 states that there was a large quantity of Kilo bags of Cocaine piled up in the hold of the boat.

(c) CI–1 told Agent McShaffry that while he was on the fishing boat at the Lobster House dock he/she personally observed 4 (four) automatic weapons that included 2 mini 14 type assault weapons with two 50 round clips taped together. CI–1 stated that he saw four crew members on the boat. All the crew members were said to be Latin possibly Cuban.

(d) CI–1 and Agent McShaffry went to an area of the docks where CI–1 showed Agent McShaffry a large fishing vessel with a black hull with the name "Imperial" in white letters painted on the bow.

(e) On October 1, 1991 Agent of the Task Force conducted surveillance of the area of the Lobster House dock, between the hours of 8:00 p.m. and 11:59 p.m. During this time they observed a large black steel [hulled] boat with a white pilot house. This boat had the name "IMPERIAL" painted in white on the bow. This boat was approx. 80 to 90 feet in length.

The background of the informant referred to in the application is unclear from the record. However, in his deposition, McShaffry stated that the informant had previously been arrested for outstanding bench warrants, had contacted the prosecutor's office with information about a 1986 murder and molestation of a child. In a September 27, 1991 report, McShaffry states that the informant had "been used in several Narcotics Investigations and has been a reliable source of information." He was unaware whether the informant had previously worked with other members of the prosecutor's office and had no personal knowledge whether the informant had contacts with the drug trade. In his reports McShaffry characterized the informant as "fairly reliable" and his information "possibly true."

In his September 27, 1991 report, McShaffry states that the informant told him that a scallop boat docked at the Cold Springs Harbor was involved in transporting large amounts of hashish, and that the boat would be returning to the Cold Springs Harbor "the first week of October." The informant did not know the name of the boat. However, he told McShaffry that a fisherman named "John" was a crew member who had recently been arrested in Wildwood. McShaffry checked the information and determined that a John Leszanski had been arrested in August.

In a September 28, 1991 report, McShaffry stated that he received a phone call on that date from the informant in reference to "large amounts of cocaine arriving from a fishing boat in Cold Springs [H]arbor." The informant had been in contact with a subject named "John" who was "capable of setting up large narcotics transactions from the docks." According to the informant, the boat would be coming from Jacksonville, Florida. McShaffry testified in his deposition that the informant refused to supply "John's" last name because he was "terrified" of being killed. McShaffry characterized the information he received from the informant as "vague." On September 30, 1991, the informant called McShaffry stating that he would be in contact with "John" on October 1, 1991 to set up a meeting with the captain of the vessel for the purpose of purchasing a large quantity of cocaine.

On October 1, 1991, McShaffry drove the informant to the docks at approximately 3:15 p.m. McShaffry thereupon observed the informant through binoculars meet a Hispanic male and enter a boat with a black steel hull. In his October 1, 1991 report, McShaffry states that he then left the area. In his deposition McShaffry acknowledged that he did not see the name on the boat entered by the informant and the Hispanic male. When, approximately three hours later, McShaffry picked the informant up, the informant told him that he had been introduced to a Latin male by the name of "John Walker," who "was capable of setting up large narcotics transactions...." The informant told McShaffry that the informant was then taken onto the boat where a large amount of kilogram bags of cocaine was revealed. The price for a kilo was $20,000 and the informant was told that the "buyer was to be on the dock on 10-2-91 at 1:00 p.m." According to the informant, he also observed several automatic weapons aboard and noted that the captain wore a revolver in a shoulder holster.

In the October 1, 1991 report, McShaffry states that he then drove the informant to the docks where the informant "showed me a large fishing vessel," having a black hull and identified as the

"Imperial." The informant "identified the Imperial as being the boat containing the cocaine in cargo hold."

At trial Maudsley testified that he was a self-employed commercial fisherman operating primarily in the Cape May area. He was the captain and owner of the "Imperial" for which he had paid $215,000. The boat contained a pilot house, a galley and two bunk rooms for sleeping. The boat had a crew of four people. Before hiring a crew member, Maudsley required each to read and sign an agreement not to possess or use drugs aboard the boat. He denied ever having sold or distributed drugs and stated that he had never employed a Cuban national or any other Latin–American as a crew member. He testified that the Coast Guard had boarded the boat on several occasions and that he was aware that the Coast Guard could search the boat without a warrant. Maudsley maintained a log book showing the dates and locations he had fished. The Imperial had never been in the State of Florida.

Maudsley docked his boat at the Cold Springs Harbor. On October 1, 1991, the Imperial was docked for repairs to the generator. He or a crew member was on the boat throughout the afternoon. No strangers boarded the boat that day. At approximately 4 a.m. on October 2, 1991, Maudsley awoke to work on a new piece of equipment. He left his boat shortly before 6 a.m., walking along the dock to a nearby boat. After speaking briefly with its crew, Maudsley returned to his boat. He testified that he "sensed some movement" and saw men in "battle gear" board the boat. One of the individuals "jammed a weapon in [his] back" and told him not to move. The man kicked Maudsley in the kidneys and in his back on several occasions. He patted Maudsley down, squeezing and twisting Maudsley's testicles. According to Maudsley, he was held at gunpoint for approximately thirty to forty minutes. While he was on the ground, someone came and "shoved a search warrant under [his] face." Maudsley was "terrorized" and afraid for his life. According to Maudsley, no one ever questioned him as to whether he had any narcotics or guns aboard.

When Maudsley eventually boarded his vessel, he found it totally ransacked, with papers "scattered all over the place." Damage had been done to the steps, floorboards and generator. Maudsley and his crew thereafter spent two days repairing the boat to render it seaworthy, spending approximately $150 for materials.

The defendant troopers testified that they were advised by a member of the Cape May County Prosecutor's Office that the Narcotics Unit was going to search a boat on which there were "Cuban Nationals that were armed with high powered automatic weapons." When the State Police unit reached the boat, they boarded yelling, "State Police. State Police." Trooper Brian Crain denied that he pointed a gun at Maudsley or kicked or otherwise physically abused him. Crain testified that he merely conducted a "pat down frisk" to ensure that Maudsley had no concealed weapons. Descriptions by other State Trooper defendants were similar to the description given by Trooper Crain. Within three to five minutes after boarding the boat, they were certain that no threat existed. None observed Crain pointing a weapon at Maudsley or physically abusing him.

Defendant Charles Barnett, a County Detective, testified that the State police had no involvement in gathering the information that led to the search warrant. He had informed the State Police defendants that they should expect to find several people on the boat armed with rifles and "machine pistols." According to Barnett, approximately twenty-five law enforcement officers were present on the dock during the raid.

No drugs, weapons, or Cuban Nationals were found as a result of the search.

### I

We first address Maudsley's Point II, that the trial court erred in denying their motion to compel the County defendants to disclose the identity of the informant.

In denying the motion, the trial court focused on the importance of the informant privilege and the rarity of disclosure in criminal cases. The court stressed repeatedly that its decision rested, not on the facts regarding a particular informant, but on "informants as a whole" and the need to protect the privilege "very generally, very broadly." The fact that the informant in this case was no longer used by the police and the length of time that had passed since he had been employed was "really of no consequence." The court also rejected plaintiffs' argument that the informant was no longer in danger merely because, by the time of the motion, he had not been used as an informant for several years. It questioned whether the informant would remember the events that had occurred three or four years earlier. The court concluded that plaintiffs had failed to establish a "strong need" for disclosure and had merely offered speculation and unsubstantiated allegations. It stated that while "[i]t certainly would be nice for [Maudsley] to be able to talk to this fellow ... [i]n reality, it does nothing but create further problems for both sides in the context of the case."

Under *N.J.R.E.* 516:

> A witness has a privilege to refuse to disclose the identity of a person who has furnished information purporting to disclose a violation of a provision of the laws of this State or of the United States to a representative of the State or the United States or a governmental division thereof, charged with the duty of enforcing that provision, and evidence thereof is inadmissible, unless the judge finds that (a) the identity of the person furnishing the information has already been otherwise disclosed or (b) disclosure of his identity is essential to assure a fair determination of the issues.

Generally the purpose of the informant privilege is to advance the public interest in effective law enforcement. "By preserving the anonymity of informers, the privilege encourages citizens to perform their civic duty to communicate knowledge of wrongdoing to law enforcement officials." *Grodjesk v. Faghani*, 104 *N.J.* 89, 97, 514 *A.*2d 1328 (1986). The privilege is most frequently asserted in criminal prosecutions. *Ibid.* The focus is on whether disclosure is "essential to a fair determination of a cause...." *Roviaro v. United States*, 353 *U.S.* 53, 61, 77 *S.Ct.* 623, 628, 1 *L.Ed.*2d 639, 645 (1957). In *Roviaro*, the United States

Supreme Court developed the following balancing test to deter-
mine whether fundamental fairness compelled disclosure of the
informant's identity:

> We believe that no fixed rule with respect to disclosure is justifiable. The
> problem is one that calls for balancing the public interest in protecting the flow of
> information against the individual's right to prepare his defense. Whether a
> proper balance renders nondisclosure erroneous must depend on the particular
> circumstances of each case, taking into consideration the crime charged, the
> possible defenses, the possible significance of the informer's testimony, and other
> relevant factors.

> [353 *U.S.* at 62, 77 *S.Ct.* at 628–29, 1 *L.Ed.*2d at 646.]

Our Supreme Court has adopted the *Roviaro* balancing test.
*Grodjesk, supra,* 104 *N.J.* at 99, 514 *A.*2d 1328; *State v. Milligan,*
71 *N.J.* 373, 384, 365 *A.*2d 914 (1976). That test also applies when
disclosure is sought in civil cases. *Grodjesk, supra,* 104 *N.J.* at 99,
514 *A.*2d 1328. However, in that context, the State's interests in
maintaining the confidentiality of the informer's identity "are
entitled to a greater degree of respect." *Cashen v. Spann,* 66
*N.J.* 541, 556, 334 *A.*2d 8, *cert. denied,* 423 *U.S.* 829, 96 *S.Ct.* 48, 46
*L.Ed.*2d 46 (1975).

In, *Cashen, supra,* the facts were strikingly similar to the facts
before us. *Id.* at 554, 334 *A.*2d 8. There, plaintiffs instituted a
civil action against the County Prosecutor and County Detective
arising out of an allegedly illegal search of plaintiffs' home. *Id.* at
544, 334 *A.*2d 8. The County Prosecutor's office executed the
search warrant seeking evidence of gambling activity. *Ibid.* The
detectives allegedly relied upon information provided by a "reli-
able informer" in preparing the application in support of the
warrant. *Ibid.* It was ultimately determined that the affidavit
was "grossly erroneous in significant respects and that the search
failed to reveal any evidence of gambling activity." *Ibid.* The
Court remanded for a reconsideration of plaintiff's application for
disclosure of the identity of the informer and set forth the
following balancing test to be applied:

> [T]he trial court will be required to consider all the facts bearing both on the
> possible unfairness to plaintiffs of denying disclosure of the identity of the informer
> and the possible harm which may be inflicted on State interests by disclosure. In
> evaluating the former, the court should consider *inter alia,* the nature of the claims

asserted by plaintiffs, the actual loss alleged, plaintiffs' reasons for seeking disclosure, and the likelihood that the evidence about or testimony by the informant will be necessary to plaintiffs' case. In evaluating the latter, the court should consider the risk of possible prejudice to pending or future prosecutions as well as the danger that the informant may be exposed to physical harm, harassment, or other untoward consequences. It is proper for the court to give less weight to the interests of plaintiff if it appears that he has suffered only insubstantial damages. The risk of loss to plaintiffs resulting from the nondisclosure of the informant may be pure conjecture.

[*Id.* at 555–56, 334 A.2d 8.]

No such balancing test was applied here. Although the general regard for the danger of revealing an informant's identity is one factor in the analysis, in this case the trial court erred by focusing almost exclusively on that factor and, furthermore, by giving no consideration to whether any danger existed in these circumstances. The fact that this informant had not been employed by the police since the raid on Maudsley's boat militates against the conclusion that he would be in danger if his identity were revealed. Furthermore, there can be no presumption that the informant faced danger from those he informed against because no evidence indicates such persons ever existed. If they had, presumably the police would have attempted to apprehend them and offer some explanation for the error to support the objective reasonableness of the officers' actions. Moreover, the County defendants have never alleged that this particular informant faced any actual danger. Even on appeal, their only argument in support of the court's decision is that the court rightly "considered the chilling effect on the future use of the confidential informants which disclosure would create." We conclude that disclosure of the informant's identity in this case will neither place the informant in imminent danger of retaliation nor inhibit future prosecutions.

Moreover, the trial court failed to consider "the nature of the claims asserted by plaintiffs." *Cashen, supra,* 66 *N.J.* at 555, 334 A.2d 8. Plaintiffs advance a cause of action under 42 *U.S.C.A.* § 1983, which provides a cause of action to "[e]very person who, under color of any statute, ordinance, regulation, custom or usage" of state law, is deprived of "any rights, privileges, or immunities

secured by the Constitution and laws...." To establish his § 1983 claim, Maudsley was required to prove that defendants deprived him of a federal right while they were acting under color of state law. *Gomez v. Toledo,* 446 *U.S.* 635, 640, 100 *S.Ct.* 1920, 1923, 64 *L.Ed.*2d 572, 577 (1980). Maudsley alleges that the County defendants' actions violated his constitutional right to be free from an unreasonable search and seizure. A search is unreasonable if it lacks probable cause and is not justified by exigent circumstances or special governmental needs beyond those of normal law enforcement. *State v. Smith,* 155 *N.J.* 83, 91, 713 *A.*2d 1033, *cert. denied,* —— *U.S.* ——, 119 *S.Ct.* 576, 142 *L.Ed.*2d 480 (1998); *Rawlings v. Police Dep't of Jersey City,* 133 *N.J.* 182, 188–89, 627 *A.*2d 602 (1993); *State v. Novembrino,* 105 *N.J.* 95, 105, 519 *A.*2d 820 (1987).

As a defense to civil liability for an unreasonable search, the County defendants are entitled to assert that, even if the Maudsley's allegations are true, the officers were protected by virtue of the doctrine of qualified immunity. *Malley v. Briggs,* 475 *U.S.* 335, 340–45, 106 *S.Ct.* 1092, 1095–96, 89 *L.Ed.*2d 271, 278–81 (1986); *Harlow v. Fitzgerald,* 457 *U.S.* 800, 807, 102 *S.Ct.* 2727, 2732, 73 *L.Ed.*2d 396, 403–04 (1982); *Kirk v. City of Newark,* 109 *N.J.* 173, 180–4, 536 *A.*2d 229 (1988). An officer will be afforded such immunity if he or she "reasonably, but mistakenly" concludes that probable cause existed for a search. *Anderson v. Creighton,* 483 *U.S.* 635, 641, 107 *S.Ct.* 3034, 3039, 97 *L.Ed.*2d 523, 531 (1987). Thus, in defense of a § 1983 claim based on an unreasonable search and seizure, an officer may establish either that probable cause existed for the search or, if not, that the officer's mistaken belief in the existence of probable cause was objectively reasonable based on what he or she knew. *Id.* at 641, 107 *S.Ct.* at 3039–40, 97 *L.Ed.*2d at 531–32; *Malley v. Briggs, supra,* 475 *U.S.* at 341–45, 106 *S.Ct.* at 1095–97, 89 *L.Ed.*2d at 278–81; *Kirk v. City of Newark, supra,* 109 *N.J.* at 184, 536 *A.*2d 229; *McKinney v. East Orange Mun. Corp.,* 284 *N.J.Super.* 639, 649, 666 *A.*2d 191 (App. Div.1995), *certif. denied,* 143 *N.J.* 519, 673 *A.*2d 277 (1996); *Plum-*

*mer v. Department of Corrections,* 305 *N.J.Super.* 365, 371–72, 702 *A.*2d 535 (App.Div.1997).

■ An officer is entitled to summary judgment on the immunity issue if reasonably competent officers could disagree as to the existence of probable cause based on objective indicia. *See Malley v. Briggs, supra,* 475 *U.S.* at 341, 106 *S.Ct.* at 1096, 89 *L.Ed.*2d at 278. Conversely, an officer "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Ibid.* The standard protects "all but the plainly incompetent or those who knowingly violate the law." *Ibid.*

The question of the reliability of the informant is central to plaintiffs' § 1983 claim, since they attempt to show that it was objectively unreasonable for the County defendants to have relied exclusively on the informant. Information related by an informant, though hearsay, may constitute a basis for probable cause, "so long as a substantial basis for crediting the hearsay is presented." *State v. Smith, supra,* 155 *N.J.* at 92, 713 *A.*2d 1033. The sufficiency of the information related by the informant is measured by consideration of all relevant circumstances. *Ibid.* The reliability of an informant's tip must be analyzed under the totality of circumstances. *Illinois v. Gates,* 462 *U.S.* 213, 238, 103 *S.Ct.* 2317, 2332, 76 *L.Ed.*2d 527, 528 (1983). Considered are the informant's "veracity" and his or her "basis of knowledge." *State v. Smith, supra,* 155 *N.J.* at 95–98, 713 *A.*2d 1033.

The ultimate result of the search established that the informant was at least reckless and probably untruthful about the so-called drug deal. Disclosure of his identity will permit plaintiffs to inquire as to his prior dealings with the County defendants in order to test his "veracity" and his "basis of knowledge" of the information imparted to McShaffry. The fact that the information given by the informant was probably false also raises a question of the informant's motive in fingering Maudsley and the Imperial.

Further, the informer is the single individual who participated in the bogus drug transaction. He supposedly met with the Latin drug dealer and observed the drugs and weapons on the Imperial. Thus, he is the only witness in a position to concur with or contradict what McShaffry stated in his reports which, essentially, formed the basis of Cramer's application for a search warrant. *See Roviaro v. United States, supra,* 353 *U.S.* at 67–69, 77 *S.Ct.* at 631–32, 1 *L.Ed.*2d at 649 (holding that disclosure is required when the informant is the sole participant in the illegal transaction and is "the only witness in a position to amplify or contradict" government agents); *see also State v. Roundtree,* 118 *N.J.Super.* 22, 31, 285 *A.*2d 564 (App.Div.1971) ("[d]isclosure is normally compelled when the informer was an actual participant of the crime for which the defendant is charged"). Significant here is the fact that neither McShaffry nor any other law enforcement official conducted any independent investigation of the information given by the informant regarding the Imperial, Maudsley, or his crew. Thus, the informant's knowledge of the pertinent facts is critical to plaintiffs' ability to test McShaffry's veracity or at least the accuracy of his reports which formed the basis of Cramer's application for the search warrant. We therefore reverse the order denying plaintiffs' application for disclosure.

## II

In Point I, plaintiffs argue that the trial court erred in dismissing the § 1983 claims against the County defendants based on defendants' qualified immunity. We decline to address this point. In our view, after the disclosure of the identity of the informant and plaintiffs have had an opportunity to conduct discovery, the issue of the County defendants' qualified immunity should be revisited by the trial court. At that point, the trial court should reconsider whether summary judgment in favor of the County defendants is appropriate. If not, the matter must be retried as to the County defendants.

## III

We reject plaintiffs' final point that the verdict in favor of the State Trooper defendants was against the weight of the evidence. There was sufficient evidence from which the jury could reasonably conclude that Maudsley had not been kicked, cursed at, abused, or threatened with a gun. The jury may simply have accepted the testimony of the State Troopers concerning the events surrounding the execution of the warrant. Moreover, the jury could have determined that, based on the troopers' understanding that they were engaged in a high-risk entry, which had to be executed quickly in the face of potential dangerous automatic fire power, their conduct was insufficient to subject them to liability under § 1983. Plaintiffs' motion for a new trial as to the State Trooper defendants was properly denied. *See R.* 2:10–1; *Dolson v. Anastasia,* 55 *N.J.* 2, 258 *A.*2d 706 (1969).

Affirmed in part; reversed and remanded in part.