816 A.2d 189 (2003)
357 N.J. Super. 560
Charles MAUDSLEY and Barbara Maudsley, Plaintiff-Respondents/Cross-Appellants,
v.
STATE of New Jersey, New Jersey State Police Department, Trooper Gary D. Rhile, Trooper Joseph Brown, Trooper Mark Weeks, Trooper Brian Crain, Trooper John Hunt, Trooper Steven J. Cozzi, Trooper Dennis Mcnulty, Trooper Joseph Farro, Sergeant James Kanz, and R. Militano, in their Official Capacity and Individually, Cape May County Prosecutor's Office, Cape May County Narcotics Task Force, Robert Cramer, Cape May County Narcotics Task Force Investigator, in his Official Capacity and Individually, Lieutenant A. Barnett, Supervisor of the Cape May County Narcotics Task Force, in his Official Capacity and Individually, Lower Township Police Department, Detective William Hinkle of the Lower Township Police Department, in his Official Capacity and Individually, and Cape May County Sheriff's Department, Defendant-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 7, 2002.
Decided February 27, 2003.
*192 Susanna J. Morris, Cherry Hill, argued the cause for appellants (Budd, Larner, Gross, Rosenbaum, Greenberg and Sade, attorneys; Ms. Morris, on the brief).
Lawrence S. Lustberg argued the cause for respondents (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. Lustberg, Kevin G. Walsh, Newark, and Richard A. Grossman, Brick on the brief).
Before Judges HAVEY, WELLS and PAYNE. *190
*191 The opinion of the court was delivered by WELLS, J.A.D.
Cape May County, Cape May County Prosecutor's Office, Cape May County Narcotics Task Force, Robert Cramer and Steven McShaffry, (the County defendants) appeal from the entry of a final judgment against them and in favor of plaintiffs, Charles Maudsley, in the sum of $100,000, and the Estate of his late wife, Barbara Maudsley, in the sum of $25,000. While the judgment did not award any prejudgment interest, it ordered defendants to pay $143,745.74 in counsel fees and costs to plaintiffs.
The Maudsleys cross appeal from the judge's decision denying punitive damages, prejudgment interest, and award of only one-half of the counsel fees sought.
The factual background out of which the judgment under appeal arises is described in our prior opinion, Maudsley v. State, 323 N.J.Super. 579, 733 A.2d 1220 (App. Div.1999). Briefly, Cramer, an agent of the Cape May County Narcotics Task Force (Task Force), applied for and obtained a search warrant for a vessel, the "Imperial," moored at the Lobster House dock in Lower Township. Cramer prepared the application based on information he received from McShaffry, another agent with the Task Force. McShaffry had received a tip from an unnamed informant that a large shipment of narcotics was aboard the Imperial, which had just arrived from Florida, and that its crew was heavily armed. Pursuant to a search warrant issued by a tax court judge, a large contingent of police officers, including State troopers, raided and searched the Imperial on October 2, 1991. After a forty-minute search, during which the owner and captain, Charles Maudsley, was detained and frisked, nothing was found.
The Maudsleys filed suit under 42 U.S.C. § 1983 for compensatory damages to themselves and to the Imperial, punitive damages, prejudgment interest, and counsel fees. The County defendants asserted that probable cause for the search warrant existed, but even if it did not, they were afforded a qualified immunity from liability under § 1983 protecting the officers. The Maudsleys sought the name of the confidential informant who supplied the tip and other discovery concerning the investigation leading to the issuance of the warrant. The judge denied the request for the name of the informant and eventually ruled that the search was based upon probable cause. The plaintiffs' claims under § 1983 collapsed, and the trial proceeded only on their claims of excessive force accompanying the search itself. The jury found no cause for action as to those claims. The Maudsleys appealed.
We reversed, directing that the name of the informant be produced. We stated:

*193 In Point I, plaintiffs argue that the trial court erred in dismissing the § 1983 claims against the County defendants based on defendants' qualified immunity. We decline to address this point. In our view, after the disclosure of the identity of the informant and the plaintiffs have had an opportunity to conduct discovery, the issue of the County defendants' qualified immunity should be revisited by the trial court. At that point, the trial court should reconsider whether summary judgment in favor of the County defendants is appropriate. If not, the matter must be retried as to the County defendants.

[Maudsley, supra, 323 N.J.Super. at 594, 733 A.2d 1220.]
Following our decision, the name of the informant, George McClain, was produced. Further discovery ensued revealing the details of the Task Force investigation leading to the issuance of the search warrant. The County defendants then filed a motion for summary judgment to dismiss the complaint. Because the most current precedent involving claims for damages under § 1983 holds that the issue of qualified immunity should be presented "`at the earliest possible stage in the litigation,'" Schneider v. Simonini, 163 N.J. 336, 356, 749 A.2d 336 (2000) (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589, 595 (1991), cert. denied, 531 U.S. 1146, 121 S.Ct. 1083, 148 L.Ed.2d 959 (2001)), and because the issue is one for the court not the jury, id. at 357, 749 A.2d 336, the motion and its result are a significant threshold to later rulings in the case.
The present record does not give us precisely what the judge considered on the motion. We, however, are assured from his ruling that he considered the depositions of both McShaffry and Cramer; an affidavit from Dennis Jones, an officer from Ocean City who vouched for McClain; an affidavit from an assistant prosecutor who reviewed by telephone the affidavit in support of the warrant before it was submitted to the judge; the affidavit presented to the tax court judge in support of the search warrant; McShaffry's investigative reports for the four days immediately prior to the search itself, September, 27, 28, 30 and October 1, 1991; and an affidavit from Maudsley.
Based on these submissions, the judge denied the County defendants' motion. He specifically concluded that the affidavit in support of the search warrant was insufficient to support a finding of probable cause to search the Imperial. He concluded that evidence of reliability of the informant was lacking. He also found a fact issue existed surrounding the "state of the officer's knowledge regarding the arrest and convictions as the result of information provided from ... this particular informant." The judge stated:
The depositions disclose that McShaffry and/or Cramer did some investigation into the reliability of this informant. In this regard, McShaffry relied on Cramer to check the informant's criminal record. Cramer thought he checked the record. Both officers thought that the informant had minor violations, but not criminal convictions. It turns out that in 1986 there was a conviction for burglary. There was also aan arrest then pending, an arrest which had recently been made in June of 1991 for an assault, which was apparently never mentioned to McShaffry or Cramer. This assault charge was ultimately downgraded, and according to the depositions of McShaffry and Cramer, neither had knowledge of that particular action. These officers also relied on telephone calls, as I have said, to officers in Lower Township and Ocean City about the reliability of this *194 informant. Detective Dennis Jones, in particular, of Ocean City, has submitted an affidavit in conjunction with this motion that he had knowledge of the informant and that based upon his own use of this informant, Detective Jones believed him to be reliable. This affidavit in this Court's view, however, is totally lacking in specificity and of little use on the issues before this court. I understand and do realize that it is true that this affidavit came some nine years after the events in this particular case. But it's generality, nonetheless is inexcusable. If the content of that affidavit is all that was given to McShaffry, then our standard of probable cause has been substantially eroded. No information has been provided by Detective Martin from Lower Township regarding his use of this informant. Although, McShaffry claims to have relied upon that information as well.
....
In addition, in regard to that particular affidavit, while the affidavit alleges numerous arrests and convictions, it does not mention any investigation into the informer's reliability or the contact with other officers at the timeor at this particular time, or at any prior time; that is, namely the Ocean City or Lower Township officers. But the affidavit certainly, as I've indicatedindicated in 5A that there had been numerous arrests and convictions. There's no information in the affidavit stating that McShaffry had reason to believe that the informer was reliable, other than as based upon an inference which may be drawn, of course, from the statement contained in 5A, that numerousnumerous arrests and convictions had been made based upon information provided by this particular informant.
The judge also found the facts surrounding the officers' independent investigation of McClain's tip either inconclusive or disputed in material respects. First, a fact issue remained "as to whether Officer McShaffry actually saw the informant enter the vessel in question." The judge reviewed the evidence on that point:
McShaffry, in response to the request, transported the agent (sic) and watched him walk to the rear of the docks to meet an allegedly Hispanic individual and board a boat with a black hull. And I know that there's some controversy factually about those circumstances that day. Sometime later, and according to the defendant's submissions, approximately 3-1/2 hours later, McShaffry was informed that the informant had been taken to the cargo hold of the boat and that he was shown a large amount of cocaine packaged in kilo gram form bags in the form of bricks. The informant also said that he observed several automatic weapons on board, including many machine guns, extra ammunition, 9 millimeter machine pistols and a revolver that the captain allegedly wore in a holsteror had in a holsshoulder holster on the vessel. These facts are again disputed by the captain who says no one was aboard his vessel the entire day preceding or the entire day in question other than his own crew. McShaffry then alleges that the informant identified the boat in which he had witnessed the drugs and the automatic weapons, and this was a black hulled boat named The Imperial. He identified The Imperial, according to McShaffry, as the boat containing the contraband.
Secondly, the judge concluded that the officers failed to reach out to other law enforcement agencies such as the Coast Guard, the DEA or the State Police to verify McClain's tip.
*195 Thirdly, the judge rejected the argument that the County defendants could rely on an assistant prosecutor's review of the affidavit to be submitted to the judge in support of the warrant. The judge stated:
Reliance is also placed by the defendants upon the assistant prosecutor's review of the affidavit in support of the search warrant. The assistant prosecutor, who at the time was James Herlihy, submitted an affidavit in responin support of this particular motion for summary judgment regarding his recollection of his particular review. He states that he reviewed the affidavit and approved probable cause. However, his recollection of the events was not very clear. Again, I realize that that was nine years ago. He did not see the application and believes it was read to him over the phone. He believed the informant had previously given him information resulting in arrests and convictions. He did not address in his affidavit, nor does the defense present any information to this court that the information in the affidavit was such as to give a basis for belief that this informer had the context and the ability to be involved, and to infiltrate the drug operation alleged to be occurring aboard The Imperial.
Fourthly, the judge found the evidence of a claim of exigent circumstances in obtaining the warrant unsupported. He stated:
Lastly, the defendant claimed that exigent circumstances justify any shortfall in their investigation and sufficient exigent circumstances to support a reasonable belief and the existence of probable cause. Here again, I have to repeat that the operation began with some information being provided as early as September 27th, 1991. The search took place on October 2nd. Admittedly, the bulk of the information and the hustle and bustle occurred on October 1st. There was, nonetheless, better than four days for investigation into the basis of knowledge of this particular informant. The defendants claim that the basis of knowledge, which they accepted, if it found to be true, is that this informer reported actually seeing a large quantity of drugs and an arsenal of weapons. Defendant accepted that statement without question. Given the amount of time between the first notice of drug activity and the ultimate search, it is not this Court'sthis Court cannot say that exitexigexigent circumstances could reasonably exist in that context.
Finally the judge carefully reviewed both our opinion and the opinion in Schneider. He announced that the test for granting qualified immunity rested on whether the officers had an objectively reasonable basis to apply for a search warrant. He concluded that he could not determine the issue as a matter of law because it essentially turned on the question of whether the officers adequately investigated McClain's reliability and the basis of his knowledge about the Imperial, its crew, and cargo. He ruled:
Significant here is the fact that neither McShaffry nor any other law enforcement official conducted any independent investigation of the information given by the informant regarding The Imperial, Maudsley or his crew.
Thereafter, between February 20, 2001 and February 28, 2001, the judge presided over a bench trial. On March 14, 2001, in an oral decision, he denied the County defendants' motion to dismiss the complaint on the defense of qualified immunity. On March 23, 2001, the judge awarded damages to the Maudsleys in the sum of $100,000 to Charles and per quod damages *196 to the late Barbara Maudsley in the sum of $25,000. At the same time, he denied an award of punitive damages. In a later ruling in May 2001, the judge denied prejudgment interest as a matter of law and in his signed judgment awarded plaintiffs $143,745.74 "as proportional reimbursement" for legal fees and costs.
We recite the evidence as it emerged at the February 2001 trial as we glean it from the record. McShaffry and Cramer first came into contact with George McClain in June 1991, when McClain offered to serve as a confidential informant for the Narcotics Task Force. When McClain first met with McShaffry and Cramer, he told them that he wanted to volunteer information simply because he wanted to help stop drug traffic. McClain did not request to be paid for his information. McClain told the officers that he had used drugs in the past, and that he had previously provided information regarding illegal activity to other police officers. Specifically, McClain stated that he had provided information to Detective Dennis Jones of the Ocean City Police Department and Detective Robert Martin of the Lower Township Police Department. McClain also stated that he had been arrested previously. Before the meeting ended, McClain stated that he would try to set up a narcotics buy and would be in contact with them.
Sometime after this meeting, Cramer did a criminal history check on McClain which revealed that he had been convicted on a burglary charge and that he had a pending assault charge. It is unclear whether McClain told the officers about the burglary charge; however, he did not tell the detectives about the pending assault charge.[1] Cramer did not inform McShaffry about McClain's past record. Meanwhile, McShaffry contacted Detective Jones from Ocean City and Detective Martin from Lower Township. According to McShaffry, both of these officers vouched for McClain, stating that he had given them information leading to arrests and convictions. McShaffry advised Cramer about these conversations.
From July 1991 through October 1991, McShaffry was in almost daily contact with McClain. Moreover, from July 3, 1991 to August 16, 1991, McClain arranged five street level drug buys with McShaffry acting, undercover, as a buyer. The buys totaled about $900, the sellers were arrested, but the record does not reveal whether the sellers were ever convicted. Based on these buys, McShaffry indicated that McClain's tips up to that about the Imperial had been accurate.
On September 27, 1991, McClain informed the prosecutor's office that he possessed information regarding an unsolved child molestation/murder case. He also claimed that a man named "John," who had recently been arrested, was importing hashish into the Wildwood area. McShaffry checked the information and determined that a John Leszanski had been arrested in August 1991. Nevertheless, the record reveals no further investigation, charges, arrests, or convictions followed as a result of these two tips. On the same day, McClain also informed the officers that a large shipment of cocaine would soon be arriving in Cape May aboard a fishing boat from Florida.
On September 28, 1991, McClain told McShaffry that he had been in touch with a subject named "John" who was dealing drugs from the Lobster House docks in *197 Cape May and who was "capable of setting up narcotics transactions from the docks." McClain asserted that he could not supply "John's" last name because he was "terrified" of being killed. On September 30, 1991, McClain called McShaffry stating that he would be in contact with "John" on October 1, 1991 to set up a meeting with the captain of the Florida fishing vessel for the purpose of purchasing a large quantity of cocaine. No additional independent investigation was done by any detectives concerning "John," the arriving vessel, or the circumstances surrounding the basis of McClain's knowledge of John or of the substance of the tip.
On October 1, 1991, McClain telephoned McShaffry to tell him that the fishing boat had docked and that he wanted to meet with McShaffry. McShaffry conferred with Cramer. McShaffry then met and spoke with McClain beneath the Cape May bridge where, at that time, McClain told McShaffry that he had arranged a meeting with the captain of the boat. McShaffry drove McClain to the dock at approximately 3:15 p.m. From a vantage point in the parking lot of the Lobster House, McShaffry, using binoculars, observed McClain meet a Hispanic male and enter a vessel with a black steel hull. McShaffry then left the scene. McShaffry acknowledged that he did not see the name of the vessel.
About three hours later, McShaffry picked McClain up. McClain told McShaffry that he had been introduced to a Latin male named "John Walker." John Walker was McClain's contact and the person who knew the crew of the vessel. After meeting Walker, McClain stated that he was taken to the cargo hold of the boat where a "large" amount of cocaine was packaged in kilogram bags. While below, he met the captain and other crew members. He then taste tested the cocaine and arranged for the purchase of a kilo of cocaine for $20,000. McClain was instructed to arrive with a buyer at 1:00 p.m. the next day. According to McClain, he also observed several automatic weapons aboard and noted that the captain wore a revolver in a shoulder holster.
After McShaffry reported to Cramer, he drove McClain to a vantage point opposite the dock where McClain identified the "Imperial" as the boat he boarded containing cocaine in the cargo hold. From there, McShaffry observed the name Imperial on the bow of the boat. The two then returned to the prosecutor's office where they met with Cramer, Lieutenant Barnett, in charge of the Task Force, and Captain Rybicki, and explained what had occurred. Based on the information provided by McShaffry and McClain, Barnett and Rybicki believed that the Task Force had probable cause to request a search warrant. They instructed Cramer to prepare a search warrant application. The application was telephonically reviewed by an assistant prosecutor, and submitted to a Tax Court judge at about 2 a.m. on the morning of October 2, 1991.
In his application, Cramer described the Imperial in considerable detail. The evidence to be seized was referred to as various controlled dangerous substances, weapons and "unidentified persons at the premises...." Cramer prepared the application in support of the warrant based upon McClain and McShaffry's information. The following facts were set forth:
(a) On September 27, 1991 a confidential informant [hereafter] referred to as CI-1, who has provided information in the past that has led to the arrest and conviction of numerous persons for violations of controlled dangerous substance laws. Contacted Agent McShaffry of the Cape May County Narcotics Task Force and stated that within the next few days a large shipment of Cocaine *198 would be coming into the Lobster House docks on a fishing boat. CI-1 stated that the shipment would be coming from the south possibly Florida. CI-1 stated that he might be able to make an introduction to the people on this boat and arrange for the purchase of several kilos of Cocaine.
(b) On October 1, 1991 CI-1 contacted Agent McShaffry of the Cape May County Narcotics Task Force and stated that the boat with the shipment of Cocaine had arrived and was now tied up at the Lobster House dock in Lower Twp. CI-1 told Agent McShaffry that he needed a ride to the dock so that he could meet with the people on the boat. Agent McShaffry drove the CI to the Lobster House dock and dropped him off, and watched him walk to a large black steel [hulled] boat where he met with a Latin male.
....
This unidentified Latin male spoke to the CI briefly. Then the unidentified Latin male took CI-1 onto the boat and down into a cargo hold and showed him a pallet of clear plastic bags that contained Kilo Grams of Cocaine. CI-1 stated that the unidentified latin male told him that he would sell the Cocaine for $20,000.00 (Twenty Thousand Dollars) a Kilo. CI-1 states that there was a large quantity of Kilo bags of Cocaine piled up in the hold of the boat.
(c) CI-1 told Agent McShaffry that while he was on the fishing boat at the Lobster House dock he/she personally observed 4 (four) automatic weapons that included 2 mini 14 type assault weapons with two 50 round clips taped together. CI-1 stated that he saw four other crew members on the boat. All the crew members were said to be Latin possibly Cuban.
(d) CI-1 and Agent McShaffry went to an area of the docks where CI-1 showed Agent McShaffry a large fishing vessel with a black hull with the name `Imperial' in white letters painted on the bow.
(e) On October 1, 1991 Agent[s] of the Task Force conducted surveillance of the area of the Lobster House dock, between the hours of 8:00 p.m. and 11:59 p.m. During this time they observed a large black steel [hulled] boat with a white pilot house. This boat had the name `IMPERIAL' painted in white on the bow. This boat was approx. 80 to 90 feet in length.
While Cramer was securing the search warrant, the Task Force contacted several other agencies for support, and by 6 a.m. on October 2, 1991, the amassed force executed the warrant. After searching the Imperial for forty minutes, the Task Force uncovered absolutely no evidence of drugs, weapons or Latin crew members.
In addition to these details of the investigation, the trial judge also heard impressive and detailed testimony from two experts on the adequacy of that investigation. The County defendants called Edwin Stier, a former Deputy Director of the Division of Criminal Justice. Stier testified to a wide variety of training and experience in a career spanning nearly thirty-five years in law enforcement, particularly in narcotics investigations and drug law enforcement. Stier reviewed a long list of affidavits, depositions, and reports associated with the investigation in this case, most, if not all of which, were before the court. He then answered following series of questions:
Q. In reviewing these materials, have you reached any conclusion with respect to the reasonableness of the officers and the like?
A. Yes.
Q. And, what is that conclusion?
*199 A. My conclusion is that their conduct in using the informant in proceeding to obtain a search warrant was within the bounds of reasonable conduct for law enforcement officials.
Q. And, on what facts do you base the conclusion?
A. Well, in myin my judgment based on the history of the relationship between McShaffry and the informant, that is that the informant had actually made introductions to McShaffry to drug dealers. He had made buys. Those buys proved to be narcotics. I'm inferring that fromI don't think that there's a specific report, a lab report in here, but I'm referringinferring that from the totality of the evidence that I'vethat I've reviewed.
McShaffry and his superiors had the right to believe that the informant was providing them with reliable information. I saw nothing in thein the evidence that was provided to undermine their confidence inin the informant to the point where they would it would be likely to doubt hishis word.
When the informant provided them with information about what was essentially a higher level of narcotics trafficking. That is a large quality of cocaine on aon a fishing vessel. In my view that would raise a question about whyhow the informant could obtain information at that level of narcotics dealing when he was providing information previously about street level dealing.
But the story that the informant provided appeared to be plausible. He described an individual who had worked on a fishing vessel who had been in possessionbeen arrested in possession of hashish. And, indeed, such an individual had been arrested for possession of hashish. His explanation of how they obtained the hashish appeared to be plausible.
....
The most striking thing about the record to me was that McShaffry took the informant to the location where he was supposed to meet somebody and board a boat and, indeed, he observed the informant meet somebody and go board a boat. Itit tended to confirm that the informant was prepared to do what he said he was gonna do. Once that happened itthethe result of that information seemed quite typical to me of many investigations that I've participated in. Investigations that I know of from my role in law enforcement that people under my supervision participated in. It was not unusual that you would take the word of an individual like this and obtain a search warrant.
Q. Was the nature of the information being provided by the informant on this occasion different than information that had been supplied to him in the past?
A. Yes.
Q. In what way?
A. He was providing information about what appeared to be a higher level of drug trafficking than that which he had been providing information about previously. Although it may be a little bit except the fact that somebody has a large quality of cocaine in their possession doesn't mean that they're necessarily part of a very sophisticated narcotics distribution ring. Narcotics, unfortunately is readily accessible throughout the world. And, there are many entrepreneurs who will be in possession *200 of large quantities of cocaine for a variety of reasons.
Q. Was it unreasonable in your opinion for the officers who believe since the information was different?
A. No.
Q. Why not?
A. He had demonstrated his past reliability. He certainly indicated that he had obtained his information in a reliable way. He said he was on the boat and made these observations personally. So he wasn't passing on information that he had obtained from some third party. And, McShaffry observed the informant go onto a boat as the informant said he was going to do. And when he got back as he had said he had done.
Maudsley called Adam Mangino, a former agent of ten years experience with the Federal Drug Enforcement Agency (DEA). Among Mangino's responsibilities was training agents and police officers in New York and New Jersey in drug investigations and running basic and/or advanced narcotic training classes at police academies. While with the DEA, Mangino helped establish the Narcotics Task Forces in Monmouth and Somerset Counties and had a desk in the Middlesex County Task Force for many years. He testified as to wide experience in undercover work and in the use of informants.
Mangino, who like Stier, reviewed in detail the record of the investigation, answered a series of questions about the quality of the investigation and for a variety of reasons found it wanting. He then answered the following series of questions:
Q. Considering everything that we've gone to in this matter, and the material that you've read which is all these reports that are in evidence, do you have an opinion that a narcotic task force officer under these circumstances prior to the search warrant being obtained, would reasonably have believed that probable cause existed to get a search warrant?
A. No. I have an opinion but I don't think that they have probable cause.
Q. And, for what reason?
A. First the reliability of the information and then the corroboration of the information that was provided which turned out to be zero. I mean the only thing they corroborated was the fact that he stepped on a boat thatthat, you know, the police officer could actually see him on a boat at some point in time meeting with somebody. But as far as all the other parts of the story, they had someone who they knew had lied to them from the first day, as to the police involvement. Who actually had been controlling whatever investigation they were doing in this matter. Andand without any attempt made to find out whether or not the boat just arrived. To find out whether or not the person who owned the boat or was on the boat was of record with their office, or any other record. They never bothered to check their own indices to find out whether the files of the Cape May County Prosecutor's office contained a prior reference to that guy, to that boat, to that dock being a facility being used frequently by drug traffickers. There's a whole series of things that were not done that would have clearly shown whether or not they should have proceeded with the case.
And, I'm not saying thatthat the case couldn't have proceeded from *201 there. You know, once they got it and if they had established an observation post and saw people going on and off that were drug dealers. And, you know, the boat arriving on the right day and all those kinds of things, now you're starting to corroborate what someone had told you that in the past had given you bad information.
Q. Mr. Edwin Stiers testified for the defense in this case that in his experiences wasn't the worse case of investigation that he's ever seen. Is this the worse case of investigation you have ever seen?
A. Well at this level, yes. At other levels, no. I mean, I've seen worse than this at levels closer to the street. But once the smuggling gets involved agencies know to call the authorities that deal with cases that involve smuggling and those people do a good job.
At the conclusion of the hearing on the motion to dismiss on March 14, 2001, the judge found that (1) McShaffry had no special training in narcotics investigation or the proper use of confidential informants, but the other officers did; (2) prior to the investigation and search of the Imperial, McClain facilitated less than $900 worth of drug buys for the Task Force; (3) McClain lied about his arrest record and failed to disclose a pending charge; (4) Cramer knew of McClain's past criminal record, but McShaffry was not informed of it; (5) McClain's past contact with officers from Ocean City and Lower Township was at least five years earlier; (6) on September 27, 1991, McClain offered the prosecutor's office information regarding a homicide, which was never substantiated by the Task Force as accurate, true, or useful; (7) after receiving the initial tip on September 27, 1991 regarding the fishing boat loaded with cocaine, neither Cramer nor McShaffry sought to confirm the tip or initiate an investigation; (8) neither investigator scrutinized the informant's subsequent, more detailed tip about the same boat; and (9) after receiving information from McClain that the Imperial was loaded with cocaine and weapons, neither Cramer nor McShaffry investigated McClain's basis of knowledge. The court further found that while McShaffry did see McClain enter a vessel, that vessel was not the Imperial.
The court framed the issue as "whether the officers responsible for obtaining a search warrant ... were objectively reasonable in their belief in the existence of probable cause; that is, whether they have qualified immunity." The court then noted the County defendants' reliance on defendants' prior dealings with McClain, other officers vouching for McClain, the prosecutor's review of the search warrant, and exigent circumstances. With regard to the prosecutor's review of the search warrant, the court stated:
The assistant prosecutor who reviewed the application ... in this Court's view, does not support, nor does it allow for a reasonable belief in probable cause, (indiscernible) a trained officer taken by himself or in conjunction with the other aspects of this investigation. I say that because his review was a cursory review, which was limited to what he called the probable cause paragraph. He testified he listened to hear the magical words, and when he heard reliable informant he was satisfied. The irony is here that, in effect, his review was a rubber stamp of the investigation, and reliance here was not the reliance by the Task Force upon the prosecutor, but the prosecutor's reliance upon certain unspoken or unidentified factual foundational information.
[emphasis added].
*202 With regard to whether exigent circumstances existed, the court stated:
[Here,] there was clearly four days that went by and no investigation into anything the informant mentioned.
....
It is clear that any exigent circumstances... was completely self-created and is not a basis upon ... which a reasonable belief and probable cause can be supported. Exigent circumstances certainly does not excuse the lack of probable cause. It excuses the issuance of a warrant, but you still need probable cause. Nor does self-created exigency... create any basis for a reasonable belief in ... the existence of probable cause.
With regard to McClain's reliability, the court discussed defendants' reliance on the two officers McShaffry spoke with. The court stated:
Detective Jones' present recollection of eventsof the events understandably is not very clear. He does say he had no personal experience with this informant, but that others in his department have successfully ...utilized the informer. It is noted, too, that McShaffry indicates that his recollection of that conversation, which is undocumented again, was contrary to what Detective Jones now says, because he recalls Detective Jones saying that he personally used the informer. In any event, the information upon which reliability as far as Jones is concerned was, to say the least, stale information at the time, being more than eight to ten years old. Detective Martin's information however, was with personal use, in exchange for the payment of money. The bulk of [McClain's] activity with ... Detective Martin was also eight to ten years prior to 1991, with one contact having been stated to have been made, which I think was involved with stolen property sometime in 1989.
The court further stated:
In this case, given the staleness of the information, a reasonably prudent, a reasonably trained, objectively trained officer must proceed with caution.
....
Caution [in this case] was not exercised. This type of investigation would be adequate for street-level purchases such as was accomplished in July and August of 1991. It is not a basis to believe that the informant has accurate information about the purchase and ... sale of kilos of cocaine. The basis of this informer's knowledge of the who, the what, the when, the where and the why of his knowledge was clearly never questioned, not by ... McShaffry, not by Cramer, ... [or] ... Lieutenant Barnett. Likewise, with the defense's reliance on the prior dealings to establish reliability, because of the vast differences in purchasing street-level narcotics to the purchase of kilos of cocaine, that reliance is ... misplaced. Any trained, objectively reasonable officer would know that more is required. This case is not simply a mistake based upon a faulty reasonable investigation. This factual situation is one in which the ... investigators paid lip service to the requirements of the law of probable cause. The investigation into the reliability of the informant and the basis of his knowledge, I repeat, was minimal. While the bar is low for the defense to establish an objective reasonable belief in probable cause, it is not non-existent.
The court then concluded:
It is true that reasonable mistakes are anticipated in these kinds of investigations and should be forgiven for the sake of law enforcement and of our criminal laws, and, therefore, for the public good.

*203 On balance, therefore, there is this issue of qualified immunity. However, in this factual context it is a mistake that a reasonably objective trained officer would not have made had good police procedure been followed.
The court then discussed the experts produced on police procedure and addressed the specificity of McClain's information. Regarding McShaffry's and Cramer's lack of further investigation following McClain's tips, the court stated:
[T]hese investigators had all the resources available to them to perform these background and corroborative checks. They failed to ask the questions. They failed to pursue reasonable resources before subjecting property and people such as the plaintiff to search. Qualified immunity applies to investigations that infringe on individual rights when proper police procedure was followed and the acts or omissions are objectively reasonable to a trained officer. In this case, there was a lack of affirmative acts and a series of omissions amounting to an objectively unreasonable investigation such that qualified immunity does not apply to the failure to perform the necessary actions in the investigation.
Finally, the judge amplified his decision by discussing and distinguishing Schneider. He stated:
That Supreme Court case is a little bit complicated because of the way it ended up with two Justices being divided on the issue of probable cause and reasonable belief in probable cause. At first blush one might think that the situation is the same, but it really is not. With regard to the Schneider case, it was misidentification of a person after there was an attempt to identify the proper person by use of driver's licenses and whatever other information. But at least it was some attempt. So that was someAnd there was a mistake, which was viewed as reasonable under the circumstances. And that was the reason, in my view, why that Court believed and held that under those circumstances it was an objectively reasonable belief in probable cause that existed aside from the host of other issues that were addressed. Now in this Maudsley case, we don't have that. We have a total, in this Court's view, lack of foundational information which the officers should have looked into. They looked into some things, but simply relied on everything that the informer said based upon their believing that the informer actually saw something. Clearly that is not what the law requires in this Court's view. So I don't see the two cases as an analogous at all, and I just wanted to further amplify my decision in that regard.
We affirm the judgment on liability and the award of damages to Charles Maudsley. We accept the judge's conclusion that there was no probable cause to search the Imperial, his factual findings that the underlying investigation was faulty, and his legal conclusion that the officers were not cloaked with qualified immunity. We also affirm the denial of punitive damages substantially for the reasons stated by the judge. We are, however, constrained to reverse the award of per quod damages to the estate of Barbara Maudsley. Finally, we reverse the award of prejudgment interest and counsel fees and remand as to those issues for further proceedings.

I
To establish his § 1983 claim, Maudsley was required to prove that defendants deprived him of a federal right while they were acting under color of state law. See Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572, *204 577 (1980); Kirk v. Newark, 109 N.J. 173, 185, 536 A.2d 229 (1988). Plaintiff alleges that the County defendants' actions violated his constitutional right to be free from an unreasonable search and seizure. A search is unreasonable if it lacks probable cause and is not justified by exigent circumstances or special governmental needs beyond those of normal law enforcement. See State v. Smith, 155 N.J. 83, 91, 713 A.2d 1033 (1998), cert. denied, 525 U.S. 1033, 119 S.Ct. 576, 142 L. Ed.2d 480 (1998); State v. Novembrino, 105 N.J. 95, 105, 519 A.2d 820 (1987).
The law of probable cause sufficient to issue a search warrant is well established in New Jersey. "When determining whether probable cause exists, courts must consider the totality of the circumstances, and they must deal with probabilities." Schneider v. Simonini, 163 N.J. 336, 361, 749 A.2d 336 (2000) (citing Illinois v. Gates, 462 U.S. 213, 230-31, 238, 103 S.Ct. 2317, 2328, 2332, 76 L. Ed.2d 527, 543-44 (1983)); Novembrino, supra, 105 N.J. at 122, 519 A.2d 820 (adopting totality of the circumstances test). "Probable cause exists if at the time of the police action there `is a well grounded suspicion that a crime has been or is being committed.'" State v. Sullivan, 169 N.J. 204, 211, 777 A.2d 60 (2001) (quoting State v. Waltz, 61 N.J. 83, 87, 293 A.2d 167 (1972)). It requires nothing more than "`a practical, common sense decision whether, given all the circumstances ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" State v. Demeter, 124 N.J. 374, 380-81, 590 A.2d 1179 (1991) (quoting Gates, supra, 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548). This flexible, practical totality of the circumstances standard has been adopted because probable cause is a "`fluid conceptturning on the assessment of probabilities in particular factual contextsnot readily, or even usefully, reduced to a neat set of legal rules.'" Schneider, supra, 163 N.J. at 361, 749 A.2d 336 (quoting Gates, supra, 462 U.S. at 232, 103 S.Ct. at 2329, 76 L.Ed.2d at 544).
Information related by an informant, though hearsay, may constitute a basis for probable cause, "`so long as a substantial basis for crediting the hearsay is presented.'" Smith, supra, 155 N.J. at 92, 713 A.2d 1033 (quoting Novembrino, supra, 105 N.J. at 111, 519 A.2d 820). The sufficiency of the information related by the informant is measured by consideration of all relevant circumstances. Ibid. Hence, the reliability of an informant's tip must be analyzed under the totality of circumstances. Gates, supra, 462 U.S. at 238, 103 S.Ct. at 2332, 76 L. Ed.2d at 548. Under this standard, courts consider the informant's "`veracity'" and his or her "`basis of knowledge.'" Smith, supra, 155 N.J. at 95-98, 713 A.2d 1033. However,
[w]hen a search ... occur[s] pursuant to a warrant, the existence of probable cause is presumed to have existed for purposes of a Section 1983 cause of action based on an alleged Fourth Amendment violation. A plaintiff seeking recovery must then prove by a preponderance of the evidence that probable cause did not exist.
[Schneider, supra, 163 N.J. at 360, 749 A.2d 336.]
We are satisfied that applying these well-understood principles, the judge was correct in determining that no probable cause existed to issue a warrant to search the Imperial. In the first place, the affidavit presented to the judge to obtain the warrant failed to provide any factual support either for McClain's reliability and veracity or the basis of his knowledge of the matters upon which he was informing. McClain lied about his own criminal history, *205 a fact of which Cramer was aware but did not disclose in the affidavit. In addition, the affidavit was misleading in that neither McShaffry nor Cramer had ever verified that any convictions resulted from information supplied by McClain. Furthermore, the record supports the judge's finding that the officers failed to independently corroborate McClain's story in material respects. McClain approached the officers as a good citizen informant and himself as a clean, former user. Yet neither officer questioned McClain as to how he knew the five street sellers or the details of their business dealings. When it came to the developing story about the incoming boatload of cocaine, McClain was never probed about the source of his knowledge about the vessel or the details of his contacts with "John," who was apparently supplying him the information about the Imperial. Finally, there was not the slightest attempt to verify Maudsley's background or reputation, that the Imperial had ever been engaged in drug smuggling, or that it had ever been in Florida.
For the stated reasons, we concur with the judge's conclusion that there was no probable cause to search the Imperial.

II
As a defense to civil liability for an unreasonable search, the County defendants are entitled to assert that, even if Maudsleys' allegations that the search lacked probable cause are true, the officers were protected by virtue of the doctrine of qualified immunity. See Malley v. Briggs, 475 U.S. 335, 344-45, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271, 278-81 (1986); Kirk, supra, 109 N.J. at 179-80, 182, 536 A.2d 229. An officer will be afforded such immunity if he or she "reasonably but mistakenly" concludes that probable cause existed for a search. Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039-40, 97 L.Ed.2d 523, 531 (1987). Moreover, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley, supra, 475 U.S. at 341, 106 S.Ct. at 1096, 89 L.Ed.2d at 278.
Thus, in defense of a § 1983 claim based on an unreasonable search and seizure, the officer being sued is entitled to judgment if the officer can successfully prove: "(1) that he or she acted with probable cause; or, (2) `even if probable cause did not exist, that a reasonable police officer could have believed in its existence.'" Schneider, supra, 163 N.J. at 355, 749 A.2d 336 (quoting Kirk, supra, 109 N.J. at 184, 536 A.2d 229).
We are mindful of the purposely high threshold this standard sets in fixing the liability of law enforcement officers for the violations of a citizen's rights. The standard buttresses a policy aimed at preventing the chilling of effective law enforcement by permitting facile awards of damages in civil cases, especially where the law does not fix bright line rules; where prompt action is required; and where judgment must be exercised upon often incomplete and contradictory information.
At the same time, the threshold for § 1983 claims cannot be so high that the legitimate privacy interests of citizens can never be vindicated in the form of civil damage awards. While there is a high public policy value in effective law enforcement, judicial application of qualified immunity must not so enlarge the defense as to swallow up all liability. Such a construction would derogate from the salutary restraint embodied in § 1983 against the abusive exercise of state police powers. Recall at one point in the judicial history of § 1983 claims, proof of bad faith or actual malice was the only standard upon which a victimized plaintiff could prevail. See Schneider, supra, 163 N.J. at *206 354, 749 A.2d 336. That standard was eventually perceived to be too onerous, and such proofs were abandoned as the sole basis for recovery. History thus suggests a standard short of malice and bad faith where, upon a showing of faulty police work upon which no reasonable officer could rely, a plaintiff may recover. We conclude the judge here correctly determined this was such a case.
At the time of the summary judgment motion, the judge clearly had misgivings about the quality of the investigation leading to the search of the Imperial. The "who, what, where and why" kinds of fact questions, id. at 359, 749 A.2d 336, concerning the investigation remained disputed and, to some extent, unanswered. At trial, those misgivings ripened into the judge's conviction that the investigation was faulty in material respects, especially in light of the expert testimony. Under our usual standards of appellate review, the factual findings of the trial judge in a non-jury trial merit deference when they are supported by substantial, credible evidence. See Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). This is particularly the case here, given the judge's power as trier of fact, to accept or reject, in whole or in part, the testimony of one expert over that of another. That testimony was properly limited to opinions about the investigation, a question of fact, and did not tread upon the judge's ultimate responsibility to determine the issue of whether a qualified immunity existed. Schneider, supra, 163 N.J. at 359, 749 A.2d 336. The judge's legal conclusion of law that no qualified immunity existed also merits our acceptance. It would be wrong to conclude that the Task Force could reasonably believe it possessed probable cause based upon the incomplete and faulty investigation that occurred. The officers knew little about McClain's history and had virtually no basis upon which to assess his reliability as an informant about a major marine drug smuggling operation. McClain only partially disclosed his arrest history. Additionally, the record gives short shrift to his tip about a child molestation/homicide investigation, the only other serious matter about which he informed. The cursory vouching by other officers was stale in time and unspecific in detail.
Further, the basis of McClain's current knowledge of drug trafficking was suspect at best and in any event, gave no indication that McClain was, himself, a player in cocaine distribution or that he knew anyone above the street level who was. True, under circumstances largely unexplained, McClain was able to set up five street buys of suspected narcotics. However, from whom, where, and when McClain came upon knowledge of a major marine drug smuggling operation went uninvestigated by the Task Force. Finally, McClain's sketchy knowledge of the Imperial went completely uninvestigated by anyone in the Task Force. A very short period of surveillance of the vessel revealed nothing; no background check of Maudsley was ordered or considered; and no one reached out for supportive information from the FBI, the Coast Guard, or the State Police about the Imperial. In short, we find no sound reason to depart from the judge's legal conclusion that the County defendants cannot benefit from qualified immunity. Accordingly, we affirm his judgment in that respect.

III
We are constrained to reverse the per quod award to the Estate of Barbara Maudsley. We note that Barbara Maudsley died prior to the second trial. However, both she and Maudsley had been deposed *207 and testified in the first trial.[2] The parties consented to the judge's consideration of that evidence in the second trial. He rested his decision about both liability for and the amount of the per quod award on that evidence. The judge stated in his March 14, 2001 ruling:
I also find that Charles Maudsley suffered a post-traumatic stress disorder as a result of some period ofor for some period of that thatand that it affected the marital relation. I find that Mr. Maudsley and Ms. Maudsley have been truthful and creditable regarding the consequences each suffered.
A per quod claim is only maintainable by reason of a spouse's personal injury and depends upon and is incidental to the spouses personal injury action. Rex v. Hutner, 26 N.J. 489, 491-92, 140 A.2d 753 (1958). We have characterized a per quod claim as a derivative claim, not a separate cause of action. Tichenor v. Santillo 218 N.J.Super. 165, 173, 527 A.2d 78 (App.Div. 1987); Wimmer v. Coombs, 198 N.J.Super. 184, 188, 486 A.2d 916 (App.Div.1985); Boyd v. Steele, 107 N.J.Super. 405, 410, 258 A.2d 719 (App.Div.1969).
Plaintiff argues that a spouse may recover for egregious constitutional violations visited upon her husband. Defendants' argue that a claim for loss of consortium under New Jersey law is a derivative claim and as such, is not actionable under § 1983. Here, it is plaintiff, Charles Maudsley, who has allegedly suffered injuries based on a deprivation of federal law. Barbara Maudsley's loss of consortium claim does not represent an injury based on a deprivation of her federal rights, rather, it is a derivative claim.
Neither the Third Circuit, the New Jersey Supreme Court, nor this court, has expressly held that a spouse's claim for loss of consortium is cognizable under § 1983.
The Third Circuit has expressly declined to address the viability of a loss of consortium claim brought by the spouse of an injured § 1983 plaintiff. See Livingstone v. North Belle Vernon Bor., 12 F.3d 1205, 1215 n. 10 (3d Cir.1993), appeal after remand, 91 F.3d 515 (1992), cert. denied, 520 U.S. 1142, 117 S.Ct. 1311, 137 L.Ed.2d 474 (1997), appeal after remand 211 F.3d 1262 (2000), cert. denied, 532 U.S. 906, 121 S.Ct. 1230, 149 L.Ed.2d 139 (2001) ("[Defendants] contend that [plaintiff's] claim for loss of consortium is not recognized under section 1983 .... We do not consider [this] argument[]."); Kulwicki v. Dawson, 969 F.2d 1454, 1457, 1467 n. 15 (3d Cir.1992) (noting that court will not address merits of § 1983 claims, of which loss of consortium was one such claim, on interlocutory appeal).
In addition, other federal circuit and district courts have held that claims for loss of consortium are not cognizable under § 1983. See Niehus v. Liberio, 973 F.2d 526, 532-34 (7th Cir.1992) (in a § 1983 action, discussing the nature of a loss of consortium claim and holding that spouse cannot recover damages under the Constitution for loss of consortium); Berry v. City of Muskogee, 900 F.2d 1489, 1506-07 (10th Cir.1990) (plaintiffs not entitled to loss of consortium damages because § 1983 creates a federal remedy only for the party injured); Stallworth v. City of Cleveland, 893 F.2d 830, 838 (6th Cir.1990) (dismissing husband's request for recovery for loss of consortium under § 1983 because wife, rather than her husband, was *208 the one who suffered a deprivation of her civil rights); Wiers v. Barnes, 925 F.Supp. 1079, 1095-96 (D.Del.1996) (no authority to consider a derivative loss of consortium claim under § 1983); Verde v. Philadelphia, 862 F.Supp. 1329, 1337 (E.D.Pa. 1994)(loss of consortium claim cannot derive from § 1983 claim).
Thus, it seems to be well established that a spouse, like Barbara Maudsley, has no standing to raise § 1983 claims resting on violations of her husband's constitutional rights.
We are persuaded that per quod claims for loss of consortium, purely derivative under New Jersey law, are not cognizable under § 1983. We accept the reasoning of those federal courts that have spoken on the issue and expressly denied such awards. Here, Barbara Maudsley did not claim that her Fourth Amendment rights were violated. Instead, she alleged that she suffered a derivative loss. As the court in Wiers, supra, 925 F.Supp. at 1095-96, stated:
there is no authority to consider a loss of consortium claim deriving from a claim of injury by an injured spouse brought pursuant to 42 U.S.C. § 1983. The purpose of section 1983 claims, as intended by Congress, was to provide a federal forum to remedy deprivations of civil rights. It was intended to create `a species of tort liability' in favor of persons deprived of federally secured rights, not to provide a mechanism for vindication of state torts derived from another's section 1983 claim. (citations omitted).
Thus, § 1983 permits suit only for the abridgment of one's own constitutional rights. See, e.g., Berry, supra, 900 F.2d at 1507.

IV
We also affirm the judge's denial of punitive damages. The decision to award or deny punitive damages, prejudgment interest and attorney's fees rests within the sound discretion of the trial court. See, e.g., Rendine v. Pantzer, 141 N.J. 292, 661 A.2d 1202 (1995). Thus, the trial court's decision on these three issues must be reviewed under the abuse of discretion standard. See Smith v. Wade, 461 U.S. 30, 52, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632, 648-49 (1983) (whether to award punitive damages and the determination of the amount are within sound discretion of trier of fact); Coleman v. Kaye, 87 F.3d 1491, 1509 (3d Cir.1996), cert. denied, 519 U.S. 1084, 117 S.Ct. 754, 136 L.Ed.2d 691 (1997) (standard of review of an attorney's fee award is an abuse of discretion if no reasonable person would adopt district court's view); Savarese v. Agriss, 883 F.2d 1194, 1207 (3d Cir.1989) (awarding prejudgment interest is committed to discretion of district court); Packard-Bamberger & Co., Inc. v. Collier, 167 N.J. 427, 443-44, 771 A.2d 1194 (2001) (attorney's fee determination by trial courts are only disturbed upon a clear abuse of discretion); Musto v. Vidas, 333 N.J.Super., 52, 74, 754 A.2d 586 (App.Div. 2000) (award of prejudgment interest is subject to trial judge's broad discretion); Maul v. Kirkman, 270 N.J.Super. 596, 619-20, 637 A.2d 928 (App.Div.1994) (decision to award punitive damages and the amount rests in discretion of trier of fact).
Punitive damages are sums awarded apart from compensatory damages and are awarded as punishment or deterrence for particularly egregious conduct. Leimgruber v. Claridge Assocs., Ltd., 73 N.J. 450, 454, 375 A.2d 652 (1977). Generally, punitive damages are a limited remedy and must be reserved for *209 special circumstances. See Cochetti v. Desmond, 572 F.2d 102, 106 (3d Cir.1978).
In Wade, supra, 461 U.S. at 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632, 651 (1983), the Supreme Court held that a jury may impose punitive damages against defendants in a § 1983 case for conduct that demonstrated a "reckless or callous indifference to the federally protected rights of others." Thus, for a plaintiff in a § 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous. See ibid. Moreover, punitive damages might be allowed if the conduct is intentional or impelled by evil motive, ibid., but the defendant's action need not necessarily meet this higher standard. The Supreme Court stated:
[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.
[Ibid.]
Similarly, in Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49, 477 A.2d 1224 (1984), the Court held that "[t]o warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an `evilminded act' or an act accompanied by a wanton and wilful disregard of the rights of another."
In this case, the trial court held:
With regard to punitive damages ... I am satisfied that such damages are unwarranted based on this record. There have been and has been damaging testimony which would indicate that there was disregard for the property of Mr. Maudsley by the activities set in motion by the County's detectives. However, I cannot conclude the County detectives or defendants demonstrated by plaintiff's proofs the requisite state of mind. Recklessness is what is required, and recklessness is characterized by a substantial and unjustifiable risk of harm to others and by a consciousconscious disregard foror indifference to that risk. Reckless conduct is, of course, much more than mere negligence. It is a gross deviation from what a reasonable person would do at the particular time and place, and may not be determined by looking back and coming to that conclusion based on a series of events, in large part, in this case, I believe, due to a lack of training. There has been, however, some disregard for the rights of the plaintiffs demonstrated in this case .... Under the circumstances there's not been a reckless disregard for plaintiff's rights and no punitive damages may be awarded.
....
I am unable to find that the disputed incident should rise to the level of a conclusion of recklessness, even taken together with the [in]efficient investigation that ... culminated in this event.
Maudsley claims that the County defendant's actions fit the criteria used by New Jersey courts in assessing punitive damages. Defendants argue that the trial court's ruling should stand because there was no malice or reckless indifference on the part of the defendant officers.
The facts of this case do not evince the requisite "reckless or callous indifference" to plaintiff's federally-protected rights. Wade, supra, 461 U.S. at 56, 103 S.Ct. at 1640, 75 L.Ed.2d at 651. There was no evidence of malice or bad faith. Moreover, given the deference accorded to the trial judge's ruling, we conclude the record supports his denial of punitive damages.

*210 V
We also vacate so much of the judgment under appeal that denied prejudgment interest and one-half of the counsel fees sought and remand for a hearing with respect to both issues.
As to prejudgement interest, Maudsley argues that the trial court erred by applying state court rules to his application for prejudgment interest and requested attorneys' fees, and that due to the delay in receipt of relief, a prejudgment interest award is appropriate. The County defendants argue that the trial court's determination was correct under both state and federal law, and its decision should be upheld.
Following the verdict in his favor, Maudsley moved to add prejudgment interest. In its decision denying the motion, the trial court held that "[p]laintiffs are not entitled to prejudgment interest because there is no authority for this award under [§ 1983], nor is there authority for this under Rule 4:42-11(b), as the law has been applied to [§ 1983] claims." In coming to this conclusion, the court found persuasive the Third Circuit's decision in Coleman v. Kaye, 87 F.3d 1491 (1996), finding prejudgment interest unavailable to a successful § 1983 claimant under Rule 4:42-11(b) because the action was governed by federal law, but not specifically addressing the right to interest under that federal law. The trial court erred in placing reliance solely on Coleman's rejection of state law as a basis for an interest award in declining to award interest in this case, since authority apart from Coleman exists for a prejudgment interest award under federal law in § 1983 cases.
In Poleto v. Consolidated Rail Corp., 826 F.2d 1270, 1274 (3d Cir.1987), the Third Circuit held that "the availability of interest in an action arising under a federal statute is governed by federal law, not the law of the forum state." Additionally, in Garrick v. Denver, 652 F.2d 969, 971 (10th Cir.1981), the Tenth Circuit ruled that "[f]ederal standards govern the determination of damages under the federal civil rights statutes."
The plaintiffs in Poleto, supra, 826 F.2d at 1274, urged the court to apply Pennsylvania Rule of Civil Procedure 238, which allows prejudgment interest. The court held that "[b]ecause [the plaintiff's] claim... is predicated upon a violation of a federal statute, state substantive law, particularly Pennsylvania Rule of Civil Procedure 238, is not implicated." Ibid. Moreover, the court stated that "[a]ny claim to prejudgment interest must therefore be derived from federal statutory sources." Ibid.
The Third Circuit has noted the importance of federal uniformity in awarding damages under § 1983. See Basista v. Weir, 340 F.2d 74, 86 (3d Cir.1965). In Basista, supra, 340 F.2d at 86, the court stated:
We believe the benefits of the [Civil Rights] Acts were intended to be uniform throughout the United States, that the protection to the individual to be afforded by them was not intended by Congress to differ from state to state, and that the amount of damages to be recovered by the injured individual was not to vary because of the law of the state in which the federal court suit was brought. Federal common law must be applied to effect uniformity, otherwise the Civil Rights Acts would fail to effect the purposes and ends which Congress intended.
Additionally, the court's rationale underlying Basista, supra, 340 F.2d at 86, was reinforced in Savarese, supra, 883 F.2d at 1207. Thus, as is the case here, state court rules are irrelevant when determining *211 whether prejudgment interest awards are appropriate in a § 1983 case.
A majority of circuit courts that have considered the issue of the availability of prejudgment interest in a § 1983 case have held that prejudgment interest is available, although they differ over the legal basis and the proper legal standard to apply. See Schneider v. County of San Diego, 285 F.3d 784, 787 (9th Cir.2002); Gierlinger v. Gleason, 160 F.3d 858, 873 (2d Cir.1998); Malloy v. Monahan, 73 F.3d 1012, 1014-15, 1019 (10th Cir.1996); Winter v. Cerro Gordo County Conservation Bd., 925 F.2d 1069, 1070, 1073 (8th Cir.1991); Pressey v. Patterson, 898 F.2d 1018, 1026 (5th Cir.1990).
There are three basic positions as to prejudgment interest. The Second and Tenth Circuits leave the question to the discretion of the trial court. See Gierlinger, supra, 160 F.3d at 873; Malloy, supra, 73 F.3d at 1019. Beyond that, the Second Circuit appears to have articulated factors that guide discretion, which are: "`(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.'" Gierlinger, supra, 160 F.3d at 873 (quoting Securities & Exchange Comm'n v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir.1996)). The Tenth Circuit employs a similar twostep analysis in which the court determines: (1) whether prejudgment interest would serve to compensate the injured party, and (2) if prejudgment interest would compensate the injured party, whether the equities would preclude the award. Malloy, supra, 73 F.3d at 1019.
The second basic position is that taken by the Fifth and Eighth Circuits: that prejudgment interest is determined in accordance with state law. See Pressey, supra, 898 F.2d at 1026; Winter, supra, 925 F.2d at 1073.[3] The third basic position is that taken by the First Circuit: that a plaintiff must specifically request prejudgment interest from the jury. See Foley v. City of Lowell, 948 F.2d 10, 17 (1st Cir. 1991).
More importantly, it appears that the First, Second, Third and Tenth Circuits hold that federal law governs prejudgment interest awards in § 1983 actions. Furtado v. Bishop, 604 F.2d 80, 97 (1st Cir.1979) (noting that the Supreme Court indicated that federal courts should fashion appropriate rules for damages in § 1983 actions and that that the issue of prejudgment interest was closely allied with that of damages).
Here, in denying prejudgment interest, the judge relied upon, but misapplied, Coleman's essential holding that federal, not state law was applicable to plaintiff's § 1983 claim. Although, as previously stated, the Coleman court did not address the availability of interest under federal law, its reasoning was in line with the Third Circuit's more comprehensive ruling in Savarese, supra, 883 F.2d at 1207, in which it rejected the use of Pennsylvania civil procedure rules in determining whether prejudgment interest awards pursuant to § 1983 are available and remanded the matter for a redetermination of prejudgment interest under federal law. Ibid. We find the position of the Second, Third and *212 Tenth Circuits to be persuasive and reject that of the Fifth and Eighth.
Here, plaintiff's claim arose solely from § 1983.[4] New Jersey law, in particular, Rule 4:42-11(b), would apply if the claim arose under either state law alone, see Abrams v. Lightolier, Inc., 841 F.Supp. 584, 598-99 (D.N.J.1994), or under both state and federal law. See Foley, supra, 948 F.2d at 17. Here, plaintiffs did not seek prejudgment interest based upon Rule 4:42-11(b), but rather, we find that they were entitled to a prejudgment interest award as a matter of federal law.
While there are, of course, legal questions arising in § 1983 cases that are determined by state law, such as statutes of limitations, the question of relief in general is determined entirely by federal law. Damages, injunctions, costs, attorney's fees, and post-judgment interest are all determined by federal statutory and decisional law. See, e.g., Basista, supra, 340 F.2d at 87. Thus, there is no principled reason not to compute prejudgment interest in accordance with federal law.
Moreover, here, the trial court's reliance upon the New Jersey Tort Claims Act was likewise in error because it ignored the proper, exclusive federal standard for awarding prejudgment interest in lawsuits premised upon § 1983. See, e.g., Schneider, supra, 163 N.J. at 372, 749 A.2d 336 (observing that "the notice provision of the New Jersey Tort Claims Act, N.J.S.A. 59:8-8, does not apply to Section 1983 cases").
Accordingly, we remand the matter so that the trial court may determine whether a discretionary award of prejudgment interest is warranted, under federal law considering the four factors set forth in Gierlinger, supra, 160 F.3d at 873.
With respect to counsel fees, Maudsley argues that this issue should be remanded because the "trial court never offered any reasoning for arbitrarily halving the fee award."[5] The County defendants argue that since Maudsley's success against the County defendants was limited, the trial court's reduction of Maudsley's attorney's fees was reasonable.
42 U.S.C.A. § 1988(b) provides that in "any action or proceeding to enforce a provision of [§ 1983], ... the court, in its discretion, may allow the prevailing party... reasonable attorney's fee as part of the costs." Thus, here, having prevailed on his § 1983 claim, plaintiff is entitled to an award of reasonable attorneys' fees under 42 U.S.C.A. § 1988. See Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40, 50 (1983)("plaintiffs may be considered `prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit").
At the March 23, 2001 hearing the court stated that "with regard to counsel fees and costs, I am satisfied that those will be awarded." Subsequently, upon the court's request, Maudsley submitted an application for attorneys' fees and the County defendants submitted a letter brief challenging the fee petition. On May 8, 2001, without comment, the trial court denied Maudsley's counsel half of his attorney's fees and expenses. The judge stated no *213 reasons for his determination. In essence, the court, without explanation, simply halved Maudsley's requested attorneys' fees and expenses. This court, therefore, does not have the benefit of the judge's reasoning. We, therefore, remand for a redetermination of fees based upon specific findings and conclusions.
We affirm the award of compensatory damages to Charles Maudsley and the denial of an award of punitive damages. We reverse the award of per quod damages to the Estate of Barbara Maudsley and vacate that award. We vacate the denial of prejudgment interest and the disallowance of one-half of the counsel fees and remand to the trial court for further proceedings in conformity with this opinion. We do not retain jurisdiction.
NOTES
[1] McClain was charged with assault approximately one week before meeting with the detectives. The assault charge was subsequently downgraded on September 23, 1991. McShaffry and Cramer claimed to have no knowledge of this action.
[2] The record on appeal does not contain either the Maudsley depositions or their trial testimony from the first trial.
[3] However, at least one district court in the Eighth Circuit has ignored its own circuit's authority on the issue in favor of the law of the Third Circuit. See Stafford v. State, 835 F.Supp. 1136, 1148 (W.D.Mo.1993) (holding "availability of an award of pre-judgment interest in a claim arising under a federal statute is a matter of federal law, not the law of the forum state").
[4] Unlike the plaintiff in Maynard v. Mine Hill Township, 244 N.J.Super. 298, 299, 582 A.2d 315 (App.Div. 1990) whose state tort claim "mirrored a 42 U.S.C.A. § 1988 claim," plaintiff's claim here arose solely under federal law, § 1983.
[5] The exact amount requested by Maudsley's attorney was $265,170.71 for attorney fees, costs, and expenses. The court awarded Maudsley attorney fees in the amount of $133,695.87, and expenses in the amount of $10,049.92.