**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4306-15T4

GATEWAY 2001, LLC, GATEWAY
I, LLC, GATEWAY SPECIAL, INC.,
MARSHALL HARRISON STREET
APARTMENTS, LLC, and
RENE ABREU,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

SANFORD WEISS, MANHATTAN
BUILDING COMPANY and
WHITE DIAMOND PROPERTIES,
LLC,

      Defendants-Respondents/
      Cross-Appellants,

and

SYLVAN SKY GARAGE, LLC,
and LEONARD WEISS,

      Defendants.

_____

Argued February 14, 2019 – Decided July 22, 2019

Before Judges Simonelli, O'Connor and Whipple.

On appeal from the Superior Court of New Jersey, Chancery Division, Hudson County, Docket No. C-000044-12.

Dennis J. Drasco argued the cause for appellants/cross-respondents Gateway 2001, LLC, Gateway I, LLC, Gateway Special, Inc. and Marshall Harrison Street Apartments, LLC (Lum, Drasco & Positan LLC, attorneys; Dennis J. Drasco, Gerald Krovatin, Paul A. Sandars III and Bernadette H. Condon, of counsel and on the joint briefs).

Gerald Krovatin argued the cause for appellant/cross-respondent Rene Abreu (Krovatin Klingeman LLC, attorneys; Gerald Krovatin, Dennis J. Drasco, Paul A. Sandars III and Bernadette H. Condon, of counsel and on the joint briefs).

Paul H. Schafhauser argued the cause for respondents/cross-appellants (Chiesa Shahinian & Giantomasi PC, attorneys; Paul H. Schafhauser and James M. Van Splinter, on the briefs).

PER CURIAM

Plaintiffs Gateway 2001, LLC, Gateway I, LLC, Gateway Special, Inc., Marshall Harrison Street Apartments, LLC and Rene Abreu appeal from judgments and orders of the Chancery Division entered on March 1 and 17, 2016 and April 25 and 26, 2016, after a bench trial regarding a residential development construction project in Hoboken. Defendants Sanford Weiss,

Manhattan Building Company and White Diamond Properties, LLC cross appeal. Having reviewed the record, we affirm.

Notwithstanding the complex factual and procedural record, this appeal is primarily about three issues: (1) whether plaintiffs' dismissed claims are barred by the statute of limitations; (2) whether plaintiffs proved the elements of fraud; and (3) whether the judge erred calculating fees, costs and damages under various agreements. Judge Hector R. Velazquez issued comprehensive written opinions in support of the March 1 and 17, 2016 and April 25 and 26, 2016 judgments and orders that explain the relationships of the parties, entities and agreements in detail. We discern the facts essential to this appeal from the record and need not repeat all of Judge Velazquez's findings.

In 2001, plaintiff Rene Abreu and his partners in Gateway I, LLC (Gateway I), Manuel Marin, Ted Worthington and LNA Holding Co. (LNA), entered into an agreement with defendant Weiss, a developer, to build a residential and commercial rental complex called Sky Club in Hoboken. They planned to construct two towers with 326 rental units, a parking garage with 425 spaces, a gymnasium on top of the garage, and commercial space. Abreu and Weiss agreed Weiss would secure the necessary financing and manage the project through construction, after which Abreu would manage the property and

collect a portion of the rental proceeds. Abreu entered into the agreement because Weiss could secure financing through Fidelity Investments (Fidelity), a mezzanine lender. Abreu and Weiss agreed that Gateway I would have a sixty percent interest in the project and Weiss would have a forty percent interest.

After obtaining the financing, Abreu and Weiss restructured their existing companies and formed new entities to develop and manage Sky Club. Gateway I was restructured with new owners, including: Gateway Special, Inc. (Gateway Special); Gateway 2001, LLC (Gateway 2001); and 100 Marshall Associates, LLC (100 Marshall). Marshall Harrison Street Apartments, LLC (Marshall Harrison), wholly owned by Gateway I, was formed to own the land and act as the project's sponsor. Weiss's construction company, Manhattan Building Company (MBC), was the construction manager.

Gateway 2001 consisted of Abreu, Marin, Worthington and LNA. Each owned a twenty-five percent interest. Gateway 2001 held a 59.5 percent interest in Gateway I.

100 Marshall was wholly owned by Weiss and had a 39.5 percent interest in Gateway I. 100 Marshall was "to operate, manage, improve, repair, rent, lease, own, acquire, sell, assign, mortgage, hypothecate, and otherwise deal in

4

real property and its appurtenance and fixtures located at 101-119 Marshall Street and 120-126 Harrison Street."

Abreu and Weiss each owned fifty percent of Gateway Special. Gateway Special held a one percent interest in Gateway I and was its managing member. Gateway Special's by-laws provided:

(a) Rene Abreu (so long as he is an officer of [the] [c]orporation and Gateway 2001 LLC is a shareholder ("Abreu") and Sandy Weiss (so long as he is an officer and 100 Marshall Associates, LLC is a shareholder) ("Weiss") shall each co-manage the [c]orporation subject to the following caveats:

From and after the date of these by[-]laws and continuing until such time as permanent financing is placed on the [r]eal [p]roperty (as hereinabove) if Weiss and Abreu disagree as to any matter relating to the [m]anagement of the [c]orporation including but not limited to the design and construction on the project, then Weiss's decision will be final and binding on the [c]orporation; provided, however, that Weiss can[]not individually make the final binding decisions if the effect of such decision, individually or in the aggregate with all other changes made to that date increases the budget for the [p]roject (which budget has been approved by Fidelity, Weiss and Abreu) by [three percent] or more or increases any individual line item by [three percent] or more; in each case exclusive of the applicable contingency.

(b) <u>From and after the placing of permanent financing[1] on the [r]eal [p]roperty if Weiss and Abreu disagree as to any matter relating to the [m]anagement of the [c]orporation then Abreu's decision will be final and binding</u> on the [c]orporation; provided however, that Abreu can[]not individually make the final binding decision if the effect of such decision, individually or in the aggregate with all other cha[n]ges made to that date increases the operating budget (which budget has been unanimously approved by Weiss and Abreu) by [three percent] or more or increases any individual line item by [three percent] or more.

[(Emphasis added).]

Gateway Special's by-laws further provided "[i]n case of the absence of any officer of the corporation, the directors may delegate the power and duties of such officer . . . to any other officer or to any director[.]" Abreu and Weiss were both required to sign any check payable to MBC or Abreu Property Management, L.L.C. (Abreu Property Management), which was Abreu's property management company. Abreu agreed with these provisions, explaining he wanted Weiss "to build the project and get out" so he could "take over."

---

[1] Once Fidelity entered the deal, the term "permanent financing" was replaced by "the Fidelity Release Date." At trial, Abreu testified he understood the change to mean that when permanent financing was placed on the property and Fidelity was bought out of its equity position, Abreu would take over management of the property.

On October 29, 2001, Gateway I and MBC entered into a construction management agreement. MBC would receive seven percent of the construction costs, plus a $350,000 bonus if it completed the project on time within budget. After the issuance of certificates of occupancy, Abreu would manage the property through Abreu Property Management.

In December 2001, Marshall Harrison and KeyBank National Association (KeyBank) entered into a construction loan agreement. KeyBank agreed to loan up to $58,650,000.

Abreu and his Gateway 2001 partners began to complain Weiss was shutting them out of the project. On May 7, 2002, Abreu was indicted on federal charges unrelated to this case. During the pendency of his criminal case, Abreu still pursued advancement of the project with Weiss. On March 18, 2003, Abreu's accountant wrote to Weiss seeking various books and records. Weiss did not respond to the requests.

At Weiss's suggestion, in December 2003, the parties agreed to convert the project from rentals to condominiums and expected to make a profit on the conversion. Abreu initially opposed the conversion because it would deprive him of management fees. He consented after Weiss agreed to pay him $1 million in compensation.

Marshall Harrison and Gateway I entered into the Amended and Restated Limited Liability Company Agreement of Marshall/Harrison Street Apartments, LLC (December 2003 Marshall Harrison agreement). 100 Marshall was appointed as the "initial [m]anager" of Marshall Harrison and was to keep accurate books and records, and Marshall Harrison was prohibited from taking certain actions without the consent of Gateway I. The December 2003 Marshall Harrison agreement provided that "[t]he [m]anager shall at all times retain a property manager for the [p]roperty, subject to the right of the [m]ember to approve any such property management agreement." Weiss signed the December 2003 Marshall Harrison agreement as president of Gateway I and as managing member of 100 Marshall. Shortly after, Gateway 2001, Gateway Special and 100 Marshall entered into the Second Amendment to Amended and Restated Limited Liability Company Agreement of Gateway I, LLC (December 2003 Gateway I agreement), which appointed Abreu Property Management as property manager of the condominiums. Read together, these provisions intended that once construction was completed, Abreu and Weiss would co-manage the project, and Abreu would oversee the day-to-day operations through his property management company.

On March 2, 2004, Sylvan Sky Garage and Marshall Harrison negotiated an agreement, later amended on April 21, 2004, to manage the parking garage. Three days later, Weiss purchased a liquor license in his name for $125,000. He used Marshall Harrison funds to buy the liquor license but later reimbursed a portion to Marshall Harrison.

On April 27, 2004, Marshall Harrison refinanced the project and obtained an additional $36,850,000 to convert the project from apartments to condominiums. This conversion loan increased the project's total refinance request from $58,650,000 to $95,599,844.23.[2] KeyBank provided the conversion loan, which was used to buy out Fidelity's equity position, pay Gateway 2001 for the balance due to acquire the property and fund the conversion. The agreement, among other things, provided the total cost of the project was not to exceed $95.5 million.

The conversion loan included $300,000 for fitness center improvements and $3000 to upgrade each condominium unit. Weiss authorized all upgrades without consulting Abreu or the other members but claimed they were aware he was doing so. He never obtained their approval to exceed the construction budget.

---

[2] This figure was rounded to $95.5 million by the parties.

The first unit closed on July 14, 2004. Less than one month later, on August 4, 2004, a federal jury convicted Abreu of multiple offenses, and he was sentenced to seven years and three months in federal prison. Abreu did not surrender for another seventeen months, during which time he continued to seek information from Weiss. Weiss sent Abreu documents in "drips and drabs."

On September 23, 2004, Abreu's accountant, Gerald Werdann, CPA, wrote to Weiss seeking documents. Abreu, who had questions about the budget, called a meeting of the investors on September 28, 2004, at the offices of Gateway I's attorney, Victor E. Kinon. Among the attendees were Kinon, Abreu, Weiss, Worthington and Robert Greer, Weiss's chief financial officer. Prior to the meeting, Weiss gave Abreu a copy of an "Estimated Budget Analysis." The estimated budget showed a list of items with "Total Cash Outflows" of $112,675,737.

At the meeting, Weiss presented the estimated budget and a draw request,[3] which showed the "revised value (budget)" was $95.5 million. When asked why the estimated and construction budgets differed, Greer explained what mattered were the monthly construction draws submitted to the bank. Weiss agreed to

---

[3] A draw request contains line items for certain types of costs submitted to the bank to draw off the loan.

provide the documents requested by Abreu within ten days.  Abreu reminded the attendees he had to approve any upgrades, change orders or anything contrary to the budget that appeared in the loan documents.  Abreu said Weiss told him, "Fight with me later, let's get the job closed."

By letter dated October 14, 2004, Kinon produced twenty-one documents. Werdann noted the bank statements were missing, but he made no further written requests and Abreu did not file a lawsuit at the time.  Also in October 2004, Abreu received a copy of draw thirty-six, which again showed the revised budget was $95.5 million.  In subsequent draws, Weiss continually represented to the lender that the total cost of the project was $95.5 million.  As of April 2005 the project was 98.99% completed.  Abreu knew then that the costs on the estimated budget exceeded the figure submitted to KeyBank to draw on the loan, but he did not sue Weiss at that time.

Meanwhile, Abreu approached Weiss to discuss renting out basement space to a prospective tenant who wanted to use it as a kitchen to maximize the upstairs seating area in the restaurant.  The original plan was to rent the basement space to residents for storage.  Weiss advised Abreu he had already transferred ownership of the basement to the condominium association.  The change was not in the business plan, and Abreu and his partners were not happy about it.

11

Weiss asked Abreu to sign a document to "cover him" with respect to the change in the basement space. Weiss directed his attorney to prepare a Unanimous Written Consent of Directors and Shareholders of Gateway Special, Inc. (consent agreement), which Weiss and Abreu signed on March 29, 2005. This consent agreement acknowledged Weiss, acting alone, would manage the Sky Club project to "design, develop, construct, manage, and lease up the Real Estate, as more particularly set forth in the By-Laws[.]" Weiss and Abreu consented and agreed:

> that all of the actions undertaken to date in connection with the [p]roject by Sandy Weiss, including, without limitation, the right to approve and modify budgetary matters involving the [p]roject, were correct and appropriate and in the best interests of all members of Gateway and [o]wner [Marshall Harrison], and are hereby ratified and confirmed to the fullest extent permitted by law.

Abreu initially claimed he read the document and understood it to refer to the changes in the basement and the combination of two lobbies into one. However, he later acknowledged he signed the document without receiving all of the documents requested by Werdann. Abreu admitted he read the agreement before signing it and knew it specifically mentioned budgetary matters.

Also in March 2005, Abreu acquired the Louis Gelfand Company (Gelfand), which he merged with Abreu Property Management, to manage his

12

real estate properties. On May 31, 2005, Marin, Worthington and LNA removed Abreu as managing member of Gateway 2001 in anticipation of his incarceration. On December 20, 2005, Marshall Harrison retained Gelfand to manage the property, and Weiss signed the agreement. The agreement provided Gelfand would manage the commercial units at Sky Club and provide various services, such as collecting rents.

As of January 1, 2006, all of the condominium units closed or were under contract. Despite not receiving all of the documents he had requested, Abreu declined to sue Weiss at the end of 2005. On January 2, 2006, Abreu reported to federal prison to serve his sentence. Shortly after, Weiss delegated to himself all of Abreu's powers and duties as a Gateway Special officer and took complete control over Marshall Harrison. Abreu testified at a deposition that by the time he went to prison, he believed that "something [wa]s wrong" and that Weiss "ha[d] something to hide," and that he did not sue Weiss while in prison because he "didn't have all the documentation required[.]"

Weiss never consulted with Abreu after he went to prison. Weiss failed to contact or correspond with Abreu nor did he respond to requests from Abreu's agents for information about Sky Club, Marshall Harrison and the Gateway entities. In 2007, without consulting Abreu, Weiss terminated the Gelfand

agreement and decided that he would manage the property through his own property management company.

Weiss took several other actions without the consent of other partners. On June 28, 2007, without Abreu's consent, Weiss changed the management agreement between Marshall Harrison and Sylvan Sky to a lease agreement more advantageous to Marshall Harrison. Weiss also allowed some commercial tenants to stop paying rent and waived late fees or reduced rents for others.

During this period, Worthington began borrowing money from one of Weiss's other entities, White Diamond. On May 28, 2008, Worthington pledged ten percent of his membership interests in Marshall Harrison to White Diamond. Worthington and White Diamond executed promissory notes pursuant to a credit agreement. However, Worthington could only transfer his economic interest in Gateway 2001, which derived value from Gateway I's interest in Marshall Harrison. Thus, on January 7, 2010, Worthington agreed to transfer and assign his twenty-five percent economic interest in Gateway 2001 to White Diamond, which corresponded to a fifteen percent interest in Marshall Harrison. At the time, Worthington had borrowed $1.5 million from White Diamond. Shortly after the assignment, Weiss began to take a percentage of the distributions due to Gateway 2001 in partial payment of the Worthington loan. Worthington

14

never asked for Abreu's or the other members' consent to the assignment of his economic interest in Gateway 2001.[4] After learning of the unauthorized assignment, Abreu advised Weiss that it violated the Gateway I agreement. Still, Abreu did not sue Weiss.

In July 2010, Weiss sold the liquor license he purchased with Marshall Harrison funds to his restaurant group for $125,000. Abreu thought Weiss sold it at less than fair market value and without the necessary consents.

While incarcerated, Abreu made several unsuccessful requests for information from Weiss. He sought financial records, cancelled checks, general ledgers and bank statements. On November 7, 2007, Abreu's agent asked Weiss for the monthly rental income and other records. On June 24, 2009, Abreu's lawyer wrote to Weiss and requested information on bank statements, profit and loss statements and individual rent payments, along with the status of the restaurant and dry cleaning spaces. The lawyer wrote another letter to Weiss on March 17, 2010, seeking this information.

---

[4] Section 5.7 of the Gateway 2001 operating agreement stated, "[e]xcept as expressly provided for herein, no member, without the express written consent of a majority of the [m]embership [i]nterests of the [m]embers, shall sell, assign, mortgage, hypothecate, transfer, . . . or otherwise alienate, . . . of any or all of his [m]embership [i]nterests[.]"

A-4306-15T4

Meanwhile, on April 10, 2009, Abreu wrote to his son about "fraudulent, unethical and self-dealing issues that Sandy [Weiss] is engaging in[,]" which Abreu described as "damaging to the Gateway 2001 LLC." In an email to his lawyer dated September 20, 2010, Abreu asked whether he should write a stronger letter to Weiss and mention the duty of care and loyalty, his right to corporate books and records and access to the minutes. He added, "Sandy Weiss has not complied with all of the above and these should be forming the basis of our eventual lawsuit against him and his entities. Should we give him this warning?"

On October 4, 2010, Abreu emailed Worthington saying if Weiss did not comply with the document requests, provide a full and accurate accounting, follow the operating agreements and return to him the management of the project, then "we will be proceeding to the fullest extent of the law to defend and enforce all of [our] rights in 2011." Three days later, he wrote another email to Worthington saying, "I believe it is getting closer to the TIME to act more aggressively with the repeated Gateway Special Inc., Gateway [I] LLC, Marshall Harrison Apartments LLC and Gateway 2001 [o]perating [a]greements [v]iolations, [m]ismanagement and [f]raud." Abreu forwarded this email to his lawyer with the subject heading "Gateway Legal Case."

 A-4306-15T4

On January 21, 2011, Abreu again wrote to Weiss demanding information. He claimed Weiss had made unauthorized loans to Worthington, violated operating agreements and withheld financial records.

Abreu wrote to Worthington on July 18, 2011, stating:

> [W]e are also going to be suing Sanford Weiss, Manhattan Builders, Toll[] Brothers and Gruhin and Gruhin, Esqs[.] and possibly others for their respective roles in the violations of the [o]perating [a]greements of Gateway I LLC, Gateway Special, Inc. and Marshall/Harrison Street Apartments LLC, for the unauthorized use of company funds, the theft of company funds and assets, for [fraud] and other related issues.

The same day, he wrote to his lawyer saying that "[w]e will also be suing Sanford Weiss, Manhattan Builders, Toll Brothers and others for violating our various Gateway LLC's [o]perating [a]greements and for [t]heft and [f]raud."

On August 7, 2011, Abreu sent an email to his lawyer stating:

> Please protect our legal interests and we will soon be discussing our next steps. We will be holding accountable and seek recompense from all the parties that have participated in any violations and have received [d]ividends, [o]wnership [i]nterests, [p]ayments and [c]ompensation that have [not been approved] according to all of our LLC [o]perating [a]greements. We will also seek to recover all legal expenses plus damages caused to us.

A-4306-15T4

In an email chain on August 8, 2011, Abreu asked his lawyer whether Delaware's statute of limitations was more favorable than New Jersey's. Abreu asked how to "extend that time period[.]" He also wanted to know if he could sue Toll Brothers, Fidelity and KeyBank, which he described as "these [three] deep pocketed entities," noting "they got out of the picture by the end of 2005 which would be approaching the [six] year [statute of limitations] time period."

Abreu was released from prison on October 23, 2011, and immediately contacted Weiss and asked for documents. Weiss said he would get back to Abreu, but he never did. Abreu then requested the information from Werdann, who provided company ledgers. Werdann tried to get Weiss to meet with Abreu.

The meeting never happened, so plaintiffs filed a complaint on March 15, 2012, against Weiss, MBC and White Diamond. Plaintiffs sought a declaratory judgment that Abreu and Weiss were co-managers of Gateway Special and that in the event of a disagreement on any management issue, Abreu's decision would control. Plaintiffs also asserted claims for breach of fiduciary duty, breach of operating agreements, mismanagement, unauthorized transactions, self-dealing, conversion and fraud. Essentially, plaintiffs alleged Weiss breached the governing documents and his fiduciary duties by not seeking Abreu's approval to: (1) spend approximately $8.7 million on upgrades; (2) pay $1.2 million for

repairs and punch list items; (3) reduce or waive late rents; (4) retain attorneys to restructure the companies; and (5) make other unilateral decisions about the project.

In September 2012, Abreu met with Weiss, Worthington and Greer. Abreu wanted an accounting so they could reach an understanding on whether money was misspent. Greer produced a summary sheet (Greer schedule) showing the total job cost and projected profit. The Greer schedule showed that the total expenditures for Sky Club were $115,823,560.43 as of January 1, 2006, and the projected profit was $28,209,050.70.

Abreu continued to ask for documents until Hurricane Sandy in 2012, after which Weiss claimed all the documents were destroyed and discarded. Two years later, Weiss discovered fifty-two boxes of documents relating to Sky Club stored in a location different from where previously believed.

The parties retained Withum Smith Brown (WSB) to analyze all disbursements made after the final draw of the construction loan. In its report dated August 18, 2015, WSB determined that from April 1, 2005, through December 31, 2006, Marshall Harrison's bank accounts had dispersed

$35,079,331 and the project had received $94,609,002 of construction financing from KeyBank.[5] WSB concluded the entire project cost $115,823,560.

During a twelve-day bench trial, Judge Velazquez heard extensive testimony from Abreu but not Weiss. The judge also considered testimony from Stephen Pitaniello, plaintiffs' expert in engineering, construction, budgets and management. Based on his review of the books and records, Pitaniello opined Weiss paid MBC more money than the construction management agreement had contemplated. Pitaniello also concluded $7,751,000 of the total project cost was unreasonable and the result of an unapproved budget increase.

The judge also heard testimony from Gary Stetz, plaintiffs' expert in the fields of certified public accounting, forensic accounting and fraud investigation. Stetz testified about alleged damages resulting from cost overruns on the Sky Club project. He also conducted a fraud investigation of Sky Club's books and records and opined Weiss had taken advantage of Abreu's incarceration for purposes of self-enrichment through unauthorized transactions.

Jon Brody testified as plaintiffs' expert in real estate appraisal. Brody inspected the Sky Club property on four occasions to analyze the fair market

---

[5] The record does not indicate whether the WSB report was admitted into evidence.

A-4306-15T4

rental value of commercial spaces between 2006 and 2011. In his opinion, all of the subject rents were below fair market value.

Gary Rosen, a certified public accountant, fraud examiner and valuation analyst, testified as defendants' expert in the fields of accounting and forensic accounting. In Rosen's opinion, there were no damages because the proceeds of the sale of the units exceeded the excess construction costs by over $200,000, and the cost of upgrades to particular units were passed along to the new owners, which meant "the partnership recouped the cost."

After considering all the evidence, Judge Velazquez found Weiss breached his fiduciary duty to plaintiffs. On March 1, 2016, the judge issued a lengthy opinion granting plaintiffs' request for declaratory judgment, recognizing that Abreu and Weiss were co-managers of Gateway Special and that in the event of a disagreement between them on any management issue, Abreu's decision would control. The judge further declared Abreu or his affiliate company would take over as property manager for Sky Club under the December 2003 Gateway I agreement, provided that the takeover did not adversely affect the contractual rights of non-parties to the litigation.

However, the judge held that the six-year statute of limitations barred plaintiffs' claims for breach of fiduciary duty, mismanagement, self-dealing and

fraud. The judge found that before he went to prison, Abreu knew of the facts underlying his causes of action for fraud, breach of fiduciary duty, self-dealing and mismanagement. The judge found that the effective date of the accrual of these causes of action was January 2, 2006, the date Abreu reported to prison, and neither the discovery rule nor the doctrine of equitable tolling applied to these claims.

Additionally, the judge concluded plaintiffs' claims for breach of the operating agreements and the implied covenant of good faith and fair dealing accrued on the date of Weiss's breach of the governing documents. The judge found Weiss breached the Gelfand contract but denied relief because plaintiffs provided no proofs to support their damages claim. The judge also found Weiss breached the implied covenant of good faith and fair dealing on the same grounds but found plaintiffs offered no evidence to allow the court to reasonably determine the amount of management fees collected by Weiss after he terminated Abreu's chosen manager.

Regarding the conversion claim, Judge Velazquez found Weiss wrongfully took profits belonging to Gateway 2001 to satisfy the Worthington loan and failed to reimburse Marshall Harrison for the full amount it paid to purchase and transfer the liquor license. Therefore, Gateway 2001 was entitled

to a judgment against Weiss and White Diamond for $726,459 and Marshall Harrison was entitled to a judgment against Weiss for $16,700. The judgment against Weiss and White Diamond was to be satisfied by the $246,000 held by Gateway I and Weiss or White Diamond were ordered to pay $504,459.

However, on April 26, 2016, the judge reconsidered his decision to order Weiss or White Diamond to repay Gateway 2001. At this point, Abreu was the sole owner of Gateway 2001 after he bought out Worthington's share. Even though Worthington violated Gateway 2001's operating agreement by assigning his economic interest, the judge found it would be inequitable for Abreu, as sole owner of Gateway 2001, to "receive monies he never expected and was never entitled to receive." The judge did permit Gateway 2001 to seek reimbursement for any business costs or expenses that it would have deducted from Worthington's profits. This appeal followed.

I.

We first address plaintiffs' argument that the judge erred by finding that their claims were time-barred. We review a trial judge's decision as to the applicable statute of limitations de novo. Palisades at Fort Lee Condo. Ass'n v. 100 Old Palisade, LLC, 230 N.J. 427, 442 (2017); Psak, Graziano, Piasecki & Whitelaw v. Fleet Nat'l Bank, 390 N.J. Super. 199, 203 (App. Div. 2007). We

affirm substantially for the reasons articulated in the judge's well-reasoned decision.

Statutes of limitations require "plaintiffs to file their lawsuits within a prescribed time to allow defendants a fair opportunity to respond and safeguard their interests." Palisades at Fort Lee Condo. Ass'n, 230 N.J. at 443. In construing these statutes, we do not rigidly "'adhere[] to a strict rule of law' that would produce unjust results." Ibid. (quoting Lopez v. Swyer, 62 N.J. 267, 274 (1973)). Instead, the limitations period in a procedural statute of limitations is construed flexibly. R.A.C. v. P.J.S., Jr., 192 N.J. 81, 98 (2007).

A cause of action accrues, and the statute of limitations begins to run, when a plaintiff knows or has reason to know that he or she may have a basis for a claim. Lapka v. Porter Hayden Co., 162 N.J. 545, 555-56 (2000); Cumberland Cty. Bd. of Chosen Freeholders v. Vitetta Grp., 431 N.J. Super. 596, 605 (App. Div. 2013). Thus, "[t]he trigger point for the start of a cause of action under an accrual statute is when 'the facts presented would alert a reasonable person, exercising ordinary diligence, that he or she was injured due to the fault of another.'" Palisades at Fort Lee Condo. Ass'n, 230 N.J. at 443 (quoting Caravaggio v. D'Agostini, 166 N.J. 237, 246 (2001)). When a plaintiff does not know or have reason to know that he or she has a cause of action against

a defendant until after the expiration of the limitations period, a court may consider other factors.  Roa v. Roa, 200 N.J. 555, 571 (2010).  To avoid unfair results, courts rely on equitable principles such as the discovery rule or estoppel. Ibid.; Negron v. Llarena, 156 N.J. 296, 300 (1998).

The purpose of the discovery rule "is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations."  Abboud v. Viscomi, 111 N.J. 56, 62 (1988) (quoting Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 426 (1987)).  Under the discovery rule, a cause of action does not accrue until the injured party discovers or should have discovered through reasonable diligence and intelligence that he or she may have a basis for an actionable claim.  R.A.C., 192 N.J. at 98; Lopez, 62 N.J. at 272.  "The party seeking the rule's benefit bears the burden to establish it applies."  Catena v. Raytheon Co., 447 N.J. Super. 43, 53 (App. Div. 2016).

Claimants do not need to "know all of the evidence upon which they will ultimately rely."  Freeman v. State, 347 N.J. Super. 11, 29 (App. Div. 2002). The discovery rule does not require "legal certainty" of an actionable claim or knowledge of the full extent of the damages.  Lapka, 162 N.J. at 555-56; Catena, 447 N.J. Super. at 54; see also Russo Farms, Inc. v. Vineland Bd. of Educ., 144

N.J. 84, 115 (1996). A "mere suspicion" of a claim, however, is not enough. Catena, 447 N.J. Super. at 54.

N.J.S.A. 2A:14-1 applies to plaintiffs' claims. Under this "tort-based property-damage" statute of limitations, a plaintiff must commence a lawsuit within six years after the cause of action has accrued. Ibid.; Palisades at Fort Lee Condo. Ass'n, 230 N.J. at 442. The discovery rule applies to the accrual of a claim under N.J.S.A. 2A:14-1. Palisades at Fort Lee Condo. Ass'n, 230 N.J. at 443.

After reviewing the record, we conclude the evidence supports Judge Velazquez's decision. Abreu testified that in 2001 he knew that Weiss had violated the Gateway Special by-laws and his fiduciary duties because Weiss never asked him to co-sign any checks. Even so, Abreu did not file a lawsuit for eleven years. On March 18, 2003, and September 23, 2004, Abreu asked his accountant, Michael Otten, to send letters to Weiss requesting various financial documents. Weiss provided some, but not all. Abreu testified that he knew in 2003 that Weiss was breaching his fiduciary duties and violating the December 2003 Marshall Harrison agreement by failing to provide the information but chose not to sue in 2003, explaining that Weiss had asked him not to file a

A-4306-15T4

lawsuit. He also chose not to sue in 2004, although he knew that Weiss had an absolute obligation to provide those records.

At the September 28, 2004 investors' meeting, Abreu asked questions about the project's estimated budget, which was more than the budget approved by KeyBank. Abreu realized the last five draws represented to the bank that the total cost of the project was $95.5 million when, in reality, it exceeded $112 million. Abreu testified he noticed the discrepancy between the estimated and actual budgets in 2004 but again did not sue because he was waiting for more documentation. He also contemplated suing Weiss to get the additional information towards the end of 2005 when the project was almost complete. He, however, did not sue, explaining that he had personal problems at the time and "other things on [his] mind" and that he "made the decision not to."

Abreu further testified that when he reported to prison on January 2, 2006, he believed Weiss had something to hide because Weiss was not providing the requested documents. He did not sue Weiss at that time, explaining he was "in prison" and did not have "all the documentation required."

Abreu knew all he needed to know to sue Weiss before the six-year statute of limitations expired. Emails from prison indicated Abreu knew about the six-year statute of limitations, asked what could be done to "extend the time period"

27

and questioned whether Delaware would provide more time. There is no merit to Abreu's assertion he could not file the lawsuit while in prison because, while incarcerated, he had filed a counterclaim in response to Worthington's lawsuit against him. Thus, the documentary evidence and Abreu's testimony establish that at the time he went to prison, he was aware of the facts establishing his claims and of the six-year limitations period. The January 2, 2006 accrual period was appropriate, and the judge correctly held the statute of limitations had expired when Abreu filed his complaint.

We also reject plaintiffs' equitable tolling argument. Unlike the discovery rule, which postpones the accrual of a cause of action, "equitable tolling acknowledges the accrual of the action but tolls the statute of limitations because the plaintiff lacked vital information that was withheld by a defendant." Freeman, 347 N.J. Super. at 31. The doctrine also "may be available 'when a plaintiff is misled . . . and as a result fails to act within the prescribed time limit.'" Bustamante v. Borough of Paramus, 413 N.J. Super. 276, 299 (App. Div. 2010) (alteration in original) (quoting Villalobos v. Fava, 342 N.J. Super. 38, 50 (App. Div. 2001)). "[A] defendant may be denied the benefit of a statute of limitations where, by its inequitable conduct, it has caused a plaintiff to withhold

filing a complaint until after the statute has run." Trinity Church v. Lawson-Bell, 394 N.J. Super. 159, 171 (App. Div. 2007).

A court generally applies equitable tolling where a plaintiff: (1) is "induced or tricked by his [or her] adversary's misconduct" into missing the filing deadline; (2) "has 'in some extraordinary way' been prevented from asserting his [or her] rights"; or (3) "has timely asserted his [or her] rights mistakenly by either defective pleading or in the wrong forum." Binder v. Price Waterhouse & Co., 393 N.J. Super. 304, 312 (App. Div. 2007) (quoting Freeman, 347 N.J. Super. at 31). Even if a court applies equitable tolling, a plaintiff must also show that he or she "exercise[ed] reasonable insight and diligence[.]" Id. at 313 (quoting Freeman, 347 N.J. Super. at 31-32). Thus, "absent a showing of intentional inducement or trickery by a defendant, the doctrine of equitable tolling should be applied sparingly and only in the rare situation where it is demanded by sound legal principles as well as the interests of justice." Freeman, 347 N.J. Super. at 31.

The record does not establish Weiss's misconduct precluded plaintiffs from filing within the six-year limitations period. Weiss provided the estimated budget at the 2004 meeting, well before Abreu reported to prison. Moreover, Abreu knew Weiss breached his fiduciary duties by failing to fully satisfy

29

Abreu's document requests. It was Abreu's own inaction and lack of reasonable diligence that caused the delay in filing the complaint, not Weiss's inducement or trickery. Thus, the judge did not err by dismissing as time-barred the causes of action for fraud, breach of fiduciary duty, self-dealing and mismanagement.

## II.

Plaintiffs next argue the judge erred by failing to award compensatory damages for construction cost overruns, punitive damages and attorneys' fees. Both parties argue they were entitled to attorneys' fees under the governing documents. We disagree.

When we review a trial court's findings in a non-jury trial, we "ponder[] whether . . . there is substantial evidence in support of the trial judge's findings and conclusions." Sipko v. Koger, Inc., 214 N.J. 364, 376 (2013) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)). "[W]e do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]" Seidman, 205 N.J. at 169 (second alteration in original) (quoting In re Trust Created by Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008)). We give deference to a trial court's factual findings "when

the evidence is largely testimonial and involves questions of credibility." Sipko, 214 N.J. at 376 (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

"Compensatory damages are designed to compensate a plaintiff for an actual injury or loss." Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 48 (1984). To support an award of compensatory damages, the evidence must provide "some reasonable degree of certainty." Paolicelli v. Wojciechowski, 132 N.J. Super. 274, 278-79 (App. Div. 1975). Actual damages must be "real and substantial as opposed to speculative." Cortez v. Gindhart, 435 N.J. Super. 589, 603 (App. Div. 2014) (quoting Grunwald v. Bronkesh, 131 N.J. 483, 495 (1993)); see Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 375 (2011) (holding that the trial court erred in basing a damages award on an "expert's wholly speculative views"). Thus, a plaintiff must "prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate." Totaro, Duffy, Cannova & Co. v. Lane, Middleton & Co., 191 N.J. 1, 14 (2007) (quoting Lane v. Oil Delivery, Inc., 216 N.J. Super. 413, 420 (App. Div. 1987)). "[T]he exact amount of the loss need not be certain." Ibid. (quoting Donovan v. Bachstadt, 91 N.J. 434, 445 (1982)).

A-4306-15T4

"Lost profits may be recoverable if they can be established with a 'reasonable degree of certainty.'" Desai v. Bd. of Adjustment of Phillipsburg, 360 N.J. Super. 586, 595 (App. Div. 2003) (quoting Stanley Co. of Am. v. Hercules Powder Co., 16 N.J. 295, 314 (1954)). "Anticipated profits that are too remote, uncertain, or speculative are not recoverable." Ibid. A party may recover lost profits based on "sound fact[s]," not "mere opinion[s.]" Id. at 596.

Plaintiffs sought compensatory damages, relying on Pitaniello's opinion that Weiss and MBC incurred unreasonable cost overruns of $7.7 million and Stetz's opinion that defendants spent between $6.2 and $8.7 million on construction expenditures never approved or fully disclosed. Plaintiffs argue the profits on the Sky Club project would have been $39.2 million as opposed to $28 million if Weiss had used the "approved budget of $95.5 million," not the estimated budget of $115 million. Plaintiffs assert they sustained $12,099,030.44 in damages identified by Stetz and that their total damages through trial were $13,805,698.44. Given Abreu's ownership of one hundred percent of Gateway 2001 and his sixty percent interest in Sky Club, they submit that he sustained $8,283,419.07 in compensatory damages.

In his March 1, 2016 opinion, Judge Velazquez addressed all of plaintiffs' claims for compensatory damages. The judge found Marshall Harrison was

32

entitled to $16,700 for conversion of the liquor license and that Gateway 2001 was entitled to $726,459 from Weiss or White Diamond for diversion of money to pay an unauthorized loan to Worthington. The judge denied the remaining eleven claims for damages identified by Stetz, including claims for $8.7 million in unauthorized upgrades and options and $1,112,533 in unauthorized and questionable building repairs. Based on our review of the record, we agree with the judge that Stetz and Pitaniello used "a simple mathematical exercise" to calculate damages and neither expert analyzed the "reasonable costs of the upgrades" or conducted "any real estate valuations to determine the value of the units without the upgrades."

We also agree with the judge that the March 29, 2005 consent agreement bars any claims for damages related to construction expenditures arising before the agreement was executed. On that date, Abreu consented and agreed that all actions undertaken by Weiss "including, without limitation, the right to approve and modify budgetary matters involving the [p]roject, were correct and appropriate and in the best interests of all members of [Gateway I and Marshall Harrison.]" As discussed earlier, plaintiffs' claims for damages resulting from unauthorized upgrades and questionable building repairs after March 29, 2005 are time-barred; moreover, plaintiffs did not demonstrate what portion of the

construction cost overruns occurred after March 29, 2005. To be sure, Weiss had sole authority to approve or deny any upgrades and building repairs, consistent with the Gateway Special by-laws until the construction phase ended.

As the judge found, plaintiffs failed to prove that the condominium units would have yielded the same or more profits but for the alleged unauthorized upgrades. Stetz relied on the Greer schedule and the final draw to identify between $6.2 and $8.7 million in unauthorized upgrades and options. He based this calculation on "how the books and records should have been kept to collaborate with the draw schedules." He did not analyze whether the upgrades and options led to greater profits for the owners.

Pitaniello also relied on the Greer schedule and did not independently review the construction costs or consider whether the conversion to condominiums yielded additional profits for the owners. Pitaniello did not conduct a real estate valuation, determine the value of the condominium units after the upgrades or address the profitability of the project. Similarly, Stetz did not analyze the reasonable costs of the upgrades or perform a real estate valuation to determine the value of the units without any changes.

Regarding the alleged unauthorized repairs, Stetz relied on Marshall Harrison's tax returns from 2006 through 2014. He added the columns showing

34

leasehold improvements and repairs, acknowledging that he could not find checks or other documentation to support all of the expenses. He also looked at the general ledger and accounting records but said he could not "tie" any of "the stuff . . . to the tax returns," which he found "very troubling." Consequently, he took the numbers on the tax returns at "face value." He further acknowledged that the tax returns actually categorized $800,000 as "lease hold or capital improvements," not as repairs.

Rosen explained Stetz looked at eighteen condominium units (nine with and nine without upgrades) to extrapolate his findings to the entire project. Unlike Stetz or Pitaniello, Rosen looked at the sale prices for the 326 units and found that the partnership recouped the costs of upgrades to particular units by passing the expenses along to the occupants. He opined the actual sale proceeds exceeded the highest range of the excess construction costs. Rosen also used accounting principles to debunk Stetz's estimate of unauthorized building repairs.

In short, plaintiffs fail to prove they suffered actual damages or incurred lost profits. Therefore, the judge did not err by denying plaintiffs' claims for construction cost overruns. The record amply supports the judge's credibility determinations and its findings.

A-4306-15T4

Next, plaintiffs contend they are entitled to punitive damages because "[d]efendants' conduct was specifically intended to take money out of the hands of [p]laintiffs and into the pockets of Weiss and his entities." Specifically, they argue defendants engaged in intentional misconduct and misrepresentations with the intent to harm them. They also rely on the December 2003 Marshall Harrison agreement to argue that they were entitled to legal fees.

"The decision to award or deny punitive damages . . . and attorney's fees rests within the sound discretion of the trial court." Maudsley v. State, 357 N.J. Super. 560, 590 (App. Div. 2003). A court may award punitive damages "as punishment or deterrence for particularly egregious conduct." Nappe, 97 N.J. at 49; Maudsley, 357 N.J. Super. at 590. To impose punitive damages, "a defendant's conduct must be willfully and wantonly reckless or malicious." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997). Punitive damages require "an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard of the rights of another." Smith v. Whitaker, 160 N.J. 221, 241 (1999) (quoting Nappe, 97 N.J. at 49). A plaintiff "must prove by clear and convincing evidence a 'deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences.'" Id. at 242 (quoting Berg v. Reaction Motors Div., Thiokol

Chem. Corp., 37 N.J. 396, 414 (1962)). We review the trial court's decision for an abuse of discretion. Maudsley, 357 N.J. Super. at 590.

The record does not demonstrate Weiss engaged in egregious and deliberate conduct to harm plaintiffs. To the contrary, Weiss attempted to achieve a quick and successful transformation of the rental units into condominiums and make a profit for everyone involved in Sky Club. Indeed, plaintiffs made substantial profits. Undoubtedly, Weiss violated various agreements, but his conduct was not malicious or willfully and wantonly reckless. See Smith, 160 N.J. at 245 (holding an amendment to the Punitive Damages Act, N.J.S.A 2A:15-5.14, requiring award of compensatory damages as predicate for punitive damages award, was a "valid legislative attempt to curtail suits seeking redress for allegedly malicious conduct that causes no substantial injury").

We also reject plaintiffs' argument that Article 7 of the December 2003 Marshall Harrison agreement entitles them to indemnification. Plaintiffs do not identify the specific provision in Article 7 or any other provision in any documentation in the record that supports their argument, and provide no legal authority to justify indemnification. Moreover, as Judge Velazquez pointed out,

the December 2003 Marshall Harrison agreement refers to indemnification by Marshall Harrison, not Weiss, White Diamond or MBC.

We also affirm the April 25, 2016 order denying defendants' motion for indemnification, because the various governing documents unambiguously exclude indemnification for breaches of the duty of good faith and loyalty. Defendants moved for indemnification under the December 2003 amended Marshall Harrison agreement, the Gateway Special by-laws and the December 2003 Gateway I agreement, respectively. Judge Velazquez denied indemnification under all three agreements because the dismissal of Abreu's claims did not excuse Weiss's intentional breach of the various governing documents.

"As a matter of well-settled legal doctrine, it is clear that an indemnity provision is to be construed in accordance with the rules for construction of contracts generally, and hence that the judicial task is to ascertain the intention of the parties . . . ." Mantilla v. NC Mall Assocs., 167 N.J. 262, 272 (2001) (quoting Doloughty v. Blanchard Constr. Co., 139 N.J. Super. 110, 116 (Law Div. 1976)). We must afford "contractual terms 'their plain and ordinary meaning[.]'" Kieffer v. Best Buy, 205 N.J. 213, 223 (2011) (quoting M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002)). "If an indemnity

provision is unambiguous, then the words presumably will reflect the parties' expectations."  Ibid.

The intent of the three indemnification provisions is clear: directors and officers are entitled to indemnification, win or lose, as long as their actions were taken in good faith; however, decisions made in violation of the duties of loyalty and good faith are not covered.  Section 7.2 of the December 2003 Marshall Harrison agreement provides "no Covered Person[6] shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct[.]"  Similarly, the December 2003 Gateway I agreement prohibits indemnification for claims that were "the result of gross negligence or misconduct[.]"  The Gateway Special by-laws exclude indemnification if "a judgment or other final adjudication adverse to the officer or director establishes that said officer's or director's acts or omissions (i) were in breach of his duty of loyalty . . .; [or] (ii) were not in good faith[.]"

Although Judge Velazquez did not find Weiss acted with malice for punitive damages purposes, he did find Weiss deliberately violated the venture's

---

6 Under the December 2003 Marshall Harrison agreement, a "Covered Person" is defined as a "member or manager of the company[.]"  Thus, Weiss is a "Covered Person" and eligible for indemnification.

governing documents. Weiss's misconduct included, but was not limited to: terminating the Gelfand contract, issuing checks without Abreu's signature, asserting unilateral control over the project, stonewalling Abreu's request for documents and freezing out Abreu from management decisions. In his March 1, 2016 written opinion, Judge Velazquez explicitly found Weiss breached the covenant of good faith and fair dealing and violated the duty of loyalty. Because Weiss's actions were intentional and led to a judgment finding he did not act in good faith, Judge Velazquez correctly denied indemnification under all three governing documents.

## III.

We also reject plaintiffs' contention that the judge erred by dismissing their cause of action for fraud based on Weiss's misrepresentations and omissions with respect to the construction budget and his unilateral termination of the Gelfand agreement. At the outset, we agreed with the judge that plaintiffs' claims for fraud, deceit and misrepresentation were time-barred. Accordingly, we need not consider these arguments.

## IV.

Plaintiffs sought to recover $157,272.22 for attorneys' fees, experts' fees and other costs associated with the inspection of fifty-two boxes of documents,

additional depositions and supplemental reports due to defendants' disregard of their discovery obligations. The judge awarded only $2445 for attorney's fees and costs incurred in connection with the preparation of Pitaniello's supplemental report. Contrary to plaintiffs' contentions, the judge found defendants' failure to locate the documents was not in bad faith. We review sanctions for discovery misconduct for abuse of discretion. See Abtrax Pharms., Inc. v. Elkins-Sinn, Inc., 139 N.J. 499, 517 (1995); Il Grande v. DiBenedetto, 366 N.J. Super. 597, 621-22 (App. Div. 2004). We agree with the judge that plaintiffs would have incurred the expert fees regardless of when defendants produced the additional documents, hence we discern no abuse of the judge's discretion.

V.

Plaintiffs contend the judge erred by reconsidering and vacating its prior order requiring Weiss or White Diamond to reimburse them $526,825 that rightfully belonged to Gateway 2001 to satisfy the Worthington debt. They argue that the judge erred because: (1) Weiss and White Diamond improperly converted profits from Gateway 2001 by taking the distributions before their dispersal to the company; and (2) Worthington's assignment of his economic interest was invalid. We reject these arguments.

41

"Reconsideration under Rule 4:49-2 is a matter within the sound discretion of the court and is to be exercised 'for good cause shown and in the service of the ultimate goal of substantial justice.'" Casino Reinvestment Dev. Auth. v. Teller, 384 N.J. Super. 408, 413 (App. Div. 2006) (quoting Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 264 (App. Div. 1987)). We "may only disturb the decision below if [we] find[] an error which is 'clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). Our review of legal issues is de novo. Ibid.

In his March 1, 2016 opinion, Judge Velazquez explained Weiss improperly withheld money from Gateway 2001 to satisfy the Worthington loan and directed Weiss or White Diamond to reimburse $726,459, "representing the amount wrongfully withheld as of January 2016." On March 17, 2016, the court entered judgment in favor of Gateway 2001 and against Weiss for conversion with payment as follows: "(a) $246,000.00, which is being held by Gateway I, LLC; (b) $504,459.00[7] by [d]efendants Weiss and White Diamond. The

---

[7] In his April 26, 2016 reconsideration order, Judge Velazquez referred to the amount Weiss or White Diamond were ordered to pay Gateway 2001 as $526,825, not $504,459, as was ordered in the March 17, 2016 judgment. The parties do not identify this as a meaningful difference, and the record reflects it was likely a typographical error. Because we affirm Judge Velazquez's reconsideration order, any mistake is immaterial.

escrow is concluded and all future distributions shall be paid directly to Gateway 2001; and (c) $16,700.00, representing monies owed as a result of the liquor license transaction."

Defendants moved for reconsideration of the portion of the order regarding the Worthington loan. The judge denied defendants' motion to declare the assignment valid but found no equitable reason to compel Weiss or White Diamond to pay Gateway 2001, "when clearly Worthington is no longer a member of the LLC, and Abreu has not shown that he has any entitlement to these monies." The judge further found that Weiss had "paid all of the taxes attributable to the distributions," and that the payment "would likely create complicated tax consequences, and the need to amend tax returns." The judge concluded that White Diamond was entitled to retain all money that Worthington, "as a member of Gateway 2001, was lawfully entitled to receive, as and for his share of distributions and or profits."

We affirm Judge Velazquez's reconsideration order. Worthington assigned his interest in Gateway 2001 in 2010. Abreu did not purchase Worthington's share until 2014. Judge Velazquez correctly concluded it would be inequitable for Abreu to receive a sum equal to profits due to Worthington to which Abreu had no legal right. Moreover, Worthington did not deny he owed

Weiss and White Diamond more than $2 million. Although Gateway 2001's operating agreement prohibited Worthington from assigning his interest without the other members' consent, "equity looks to substance rather than form." See Assocs. Home Equity Servs., Inc. v. Troup, 343 N.J. Super. 254, 276 (App. Div. 2001).[8]

Despite that, plaintiffs argue Gateway 2001 is entitled to repayment of distributions it would have used to pay its operating expenses. By taking the loan repayments "off the top," they argue that Abreu had to fund Gateway 2001's expenses without Worthington's share of the profits. However, this ignores Judge Velazquez's order that allowed Gateway 2001 to provide a certification attesting to any business costs and expenses that would have been deducted from Worthington's profits prior to distribution.

---

[8] Because we affirm the order for reconsideration, we do not reach defendants' cross-appeal requesting we invalidate the Abreu-Worthington purchase agreement. Moreover, the judge correctly determined he had no jurisdiction to decide the issue, because defendants' answer or counterclaim failed to request this relief.

Additionally, because we agree with the judge's decision to preserve the status quo, we do not consider defendants' argument on cross-appeal that the judge erred by finding Worthington's assignment was invalid.

## VI.

Finally, we address defendants' argument on cross-appeal that Abreu is unfit to manage Sky Club because of his criminal convictions. "The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." McKelvey v. Pierce, 173 N.J. 26, 57 (2002) (quoting F.G. v. MacDonnell, 150 N.J. 550, 563 (1997)). A fiduciary owes to the dependent party "a duty of loyalty and a duty to exercise reasonable skill and care." F.G., 150 N.J. at 546. Thus "the fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship." Ibid.

The governing documents demonstrate that the parties intended for Weiss and Abreu to co-manage the project after construction and for Abreu to make the final decision when disagreements arose. Defendants argue that Abreu failed to disclose his fraudulent activities at the time he and Weiss signed the Gateway Special by-laws and therefore he should not be allowed to control or manage the multi-million dollar project. They rely on Hageman v. 28 Glen Park Associates, LLC, 402 N.J. Super. 43, 55-56 (Ch. Div. 2008), which held that the plaintiff-homeowner, "who set out on a mission to deceive everyone," and accomplished his plan, "only to have it backfire on him," could not "seek[] equitable relief

from the consequences." Reliance on <u>Hageman</u>, however, is misplaced. In <u>Hageman</u>, the plaintiff was precluded under the doctrine of unclean hands from recovering against purchasers at a foreclosure sale. <u>Ibid.</u> There is no claim of unclean hands here. Likewise, defendants' reliance, without any discussion, on <u>United States v. Jimenez</u>, 513 F.3d 62 (3d Cir. 2008), is unpersuasive because that case addressed Abreu's appeal of his convictions for mortgage and bank fraud.

Judge Velazquez correctly declined to rewrite the governing documents in light of Abreu's conviction finding "no compelling reasons to deprive Abreu of his contractual right to co-manage [Gateway Special] with binding decision[-]making authority in the event of a management dispute." The judge also found no compelling reason "to deprive Abreu of his contractual right because he is a convicted felon." Thus, we discern no error in the judge's decision to enforce the parties' agreement as written. <u>See</u> <u>Schor v. FMS Fin. Corp.</u>, 357 N.J. Super. 185, 191 (App. Div. 2002) ("[W]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written." (quoting <u>Karl's Sales & Serv., Inc. v. Gimbel Bros.</u>, 249 N.J. Super. 487, 493 (App. Div. 1991))).

We do not address the parties' remaining arguments as they lack sufficient

merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION